Alan L. GLUTH, Plaintiff,

v.

William KANGAS, et al., Defendants.

No. CIV 84–1626 PHX CAM.

United States District Court,
D. Arizona.

Aug. 22, 1988.

Memorandum April 25, 1990.

Order on Access to Courts April 27, 1990.

Memorandum on Indigency Aug. 28, 1990.

Order on Legal Supplies and
Services Aug. 28, 1990.

Robert Dauber, Law School Clinic, Arizona State University School of Law, Tempe, Ariz., for plaintiff Class.

Grant Woods, Atty. Gen., Lynne W. Abney, Asst. Atty. Gen., for defendants.

## ORDER

MUECKE, District Judge.

Having considered the Plaintiff's Motion for Summary Judgment, filed April 22, 1988, and the Response and Reply thereto, this Court hereby finds and concludes as follows:

■ Gluth's motion for summary judgment argues that he is entitled to summary judgment on all three counts of his second amended complaint. In response, the Defendants do *not* argue that a material factual dispute precludes summary judgment. Instead, the Defendants contend that because the Prison's new library access policy is constitutionally adequate and Gluth has only sought injunctive relief, Gluth's second amended complaint is therefore moot and should be dismissed.

The question of mootness will be addressed first. *Lindquist v. Idaho State Board of Corrections*, 776 F.2d 851, 853–854 (CA9 1985) is instructive in this regard. In *Lindquist*, the court stated that:

[a] case, or an issue in a case, is considered moot "if it has 'lost its character as a present, live controversy of the kind that must exist if we are to avoid advisory opinions on abstract propositions of law.'" As a general rule, however, voluntary cessation of allegedly illegal conduct does not make a case moot. But a case may become moot if "(1) it can be said with reasonable assurance that

'there is no reasonable expectation ...' that the alleged violation will recur, and (2) interim relief or events have completely eradicated the effects of the alleged violation." There is a heavy burden of proof to demonstrate mootness.

*Id.* (Citations omitted.) Because Gluth has alleged that violations continue to occur in the face of the Prison's new library access policy and that the policy itself fails to provide prisoners adequate access to the courts, this Court cannot conclude "with reasonable assurance" that the alleged violations will not continue to occur. This case is consequently far from moot.

■ The merits of Gluth's motion will now be considered. Count One of Gluth's complaint alleges that inmates denied physical access to the Prison's law library are denied meaningful access to the courts because such inmates are not afforded the assistance of trained legal assistants. In *Bounds v. Smith*, 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977), the Supreme Court stated that:

> the fundamental right to access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons *trained in the law.*

(Emphasis added.) Despite *Bounds'* clear mandate requiring training for legal assistants, the Defendants continue to provide absolutely no training to those inmates denominated "legal assistants." Instead, inmates "who appear minimally capable of assisting other inmates with legal research and writing" are approved as legal assistants. *See DMO 88–05, 2.3.1.1.* But the mere appearance of "minimal capability" cannot be equated with "train[ing] in the law." As the unhappy life of the average *pro se* prisoner complaint all too aptly illustrates, the blind can only lead the blind to oblivion. Prisoners denied physical access to the Prison's law library must receive assistance from someone trained in the law. Gluth's motion for summary judgment is therefore granted as to Count One of his second amended complaint.

■ In Count Two of his complaint, Gluth argues that inmates who enjoy some physical access to the law library are nonetheless deprived of constitutionally adequate access to the library. In response, the Defendants contend that their new library access policy comports with constitutional requirements. Perusal of the new policy is thus in order. DMO 88–05 2.2.1.1 provides that inmates shall be granted "reasonable physical access to an adequate law library." Similarly, DMO 88–05 2.2.1.2 provides that inmates "shall be provided physical access to the law library during assigned law library hours."

These new provisions must be considered against the background of Gluth's unrebutted allegations, affidavits, and exhibits. Gluth contends that: "(1) unreasonable restrictions keep inmates from gaining access to the law library; (2) inmates are permitted insufficient time in the library; (3) inmates are given inadequate notice of library turnouts; and (4) inmates are arbitrarily removed from the library." *Plaintiff's Memorandum of Points and Authorities in Support of Summary Judgment,* pp. 15–16. These contentions are meticulously supported by affidavits and other exhibits. Because the Defendants adduce no evidence to the contrary, Gluth's allegations must be taken as true. This Court consequently finds that the Defendants have a history of arbitrarily denying prisoners library access. In light of this history, the vagueness of the Defendants' new policy fails to provide detailed guidelines to thwart arbitrariness and insure that inmates will enjoy adequate law library access. Gluth's motion is therefore also granted as to Count Two of his complaint.

■ Lastly, Count Three of Gluth's complaint alleges that he was unfairly denied indigent status which rendered him unable to obtain materials necessary (e.g. stamps, paper, etc.) to prosecute his claims. The Defendants respond with a single conclusionary sentence: "Indigents are guaranteed adequate funds for necessary legal, postage, and stationary supplies. *See, generally,* Access Policy at 2.2." DMO 88–05 2.2.1.10 provides that inmates "[w]ho are

indigent are to be provided with necessary supplies free of charge to the extent that the cost of these supplies exceeds the amount in the inmate's account." But as Gluth's memorandum, affidavits, and exhibits make clear, the Defendants' indigency policy forces inmates to choose between purchasing essential hygienic supplies and essential legal supplies. This "choice" is unacceptable. *See Temple v. Ellerthorpe,* 586 F.Supp. 848, 851 (D.R.I.1984). Gluth's motion is therefore granted on Count Three of his complaint.

Accordingly, based on the foregoing, the Plaintiff's Motion for Summary Judgment is granted.

The Plaintiff shall file a proposed permanent injunction by October 3, 1988. The Defendants shall file any objections to the proposal by October 17, 1988. The Plaintiff shall reply by October 24, 1988.

### MEMORANDUM

#### I. *Introduction*

This memorandum is intended to accompany the partial final judgment on "direct" and "indirect" access to the courts. This memorandum and the partial final judgment mark the successful partial completion of a case the likes of which I have never seen before in my twenty-five years on the bench.

This lawsuit was brought on behalf of prisoners confined to the Central Unit of the Arizona State Prison at Florence. The plaintiffs sought to improve access to the courts for inmates. Inmates have a constitutional right of access to the courts; they must be provided adequate law libraries or "adequate assistance from persons trained in the law." *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977). The reason access to the courts is so important is that generally a prisoner's has no other avenue to seek redress for alleged arbitrary treatment that might rise to constitutional dimensions.

Despite the seriousness of plaintiffs' complaints, defendants demonstrated, throughout this litigation, a callous unwillingness to face the issues. The Court was forced to take extraordinary measures to compel the Arizona Department of Corrections to focus on the merits.

#### II. *Class Certification*

In the beginning, the Court had no hint of the difficulties which would follow. At the April 29, 1988 pretrial conference in this matter, the plaintiffs and defendants agreed that this lawsuit should proceed as a class action. *See* Order of May 4, 1988. Defendants' counsel even indicated that the law school clinic's participation as class counsel was appreciated. *See* Transcript of the April 29, 1988 pretrial conference, p. 8. Later, the Court defined the class:

[A]ll Central Unit inmates who seek injunctive relief because they are denied access to the courts for any of the following reasons:

A. The inmate has no physical access to the law library due to custodial status that results in cell restriction, and no meaningful alternative access to the courts is provided;

B. Although the inmate is permitted physical access to the law library, the inmate's law library access is insufficient and no meaningful alternative access to the courts is provided;

C. The inmate has insufficient funds to afford the necessary legal supplies to pursue a case and the inmate cannot qualify for indigency status;

D. The inmate qualifies for indigency status but is [nonetheless] unable to pursue a legal case because the indigency plan is inadequate.

This class action does not preclude those inmates who fall within the class from maintaining separate actions for damages.

*See* Order of July 22, 1988.

#### III. *Undisputed Facts*

Problems began when the parties filed their motions for summary judgment. Plaintiffs' briefs were supported by a thoroughly annotated statement of facts. *See* Plaintiffs' Statement of Facts (PSOF), April 22, 1988. Instead of filing a statement of facts that contradicted plaintiffs'

facts, defendants decided to rely on their newly promulgated regulations. *See* Defendants' Statement of Facts, April 8, 1988. This tactical decision to disregard plaintiffs' claims is characteristic of defendants' self-righteous approach to the entire litigation. The Court could not ignore plaintiffs' Statement of Facts. *See* Rule 11, Rules of Practice of the U.S.Dist. Court of Arizona. The following facts, among others, were not disputed by the Department of Corrections:

(1) A Central Unit prisoner may be confined to his cell, for punitive or protective reasons, sometimes for substantial periods of time. *See* PSOF # 4–6. When inmates are confined to their cells, they are not permitted to enter the Central Unit law library. *See* PSOF # 7.

(2) The Department of Corrections has attempted to provide library access to such "deadlocked" inmates by the use of a "paging system." *See* PSOF # 8.

(3) Inmate legal assistants have also been used in an attempt to provide library access for "deadlocked" inmates. *See* PSOF # 9. No training is provided for inmate legal assistants by the prison. *See* PSOF # 11–14. Literacy is the only qualification an inmate needs to become an inmate legal assistant. *See* PSOF 7b# 15–16.

(4) Inmate legal assistants are not given any additional time to work on their "clients" cases. *See* PSOF # 18. A list of available inmate legal assistants is not provided to inmates. *See* PSOF # 19.

(5) Inmate requests for personal conversations with legal assistants have been lost, ignored or denied by prison staff, often for weeks at a time. *See* PSOF # 20–21.

(6) The only personal contact allowed between legal assistants and their inmate "clients" is in the law library, and both must request a corresponding turnout time. *See* PSOF # 22–24.

(7) Inmate law library clerks receive no legal training and there are no requirements that must be met for an inmate to qualify as a law library clerk. *See* PSOF # 26.

(8) Defendants permit no more than 21 inmates in the law library during a turnout. *See* PSOF # 32.

(9) Defendants authorize less than 8 hours for protective custody inmates' library turnouts. *See* PSOF # 29 and 45–46. The library turnout for protective custody inmates is seldom filled to the 21 inmate capacity. *See* PSOF # 33–34.

(10) Inmates have complained that they are arbitrarily denied library access even when the library has not been filled to capacity. *See* PSOF # 35. Inmates also have complained frequently that they are denied access to the law library, on occasion for weeks at a time, because prison staff sometimes ignore or lose requests, arbitrarily delete names from the turnout list, and cancel turnouts. *See* PSOF # 37–38.

(11) Prison responses to inmate grievances concerning library access frequently state that inmates are denied turnout because there is no available space. *See* PSOF # 36. Prison responses to inmate grievances concerning lost or unanswered requests frequently have stated that inmates' requests were never received. *See* PSOF # 39.

(12) Prison officials apparently believe that they have discretion over which inmates will be allowed to use the law library and that they may cancel scheduled library turnouts. *See* PSOF # 42–43. No written policies limit the discretion of prison staff in determining which inmates are permitted into the law library. *See* PSOF # 44.

(13) Statistical analysis of all protective custody library turnout lists and requests for library access over a period of several months demonstrates that there is a one-in-four chance that an inmate will be denied access to the library each time he requests it, even though the library is rarely filled. *See* PSOF # 41.

(14) Prison officials schedule library turnouts at times which conflict with other scheduled activities, such as exercise periods, work details and religious services. *See* PSOF # 47. Prison officials sometimes

fail to begin library turnouts on time. *See* PSOF # 48–49.

(15) Prison policy is to remove prisoners who are "unproductive" or "abuse the law library privilege." *See* PSOF # 55. However, no written guidelines or standards have been promulgated to aid prison staff in interpreting these terms. *See* PSOF # 56.

## IV. *Summary Judgment*

Defendants' strategy of relying on its newly promulgated regulations rather than addressing the merits of plaintiffs' claims backfired.

On August 16, 1988, the Court denied defendants' motion for summary judgment. *See* Order of August 16, 1988. Defendants argued that plaintiff's complaint was moot because the prison's recently instituted library access program supposedly did not suffer from the defects alleged in plaintiff's complaint. Plaintiff argued that under the new program: (1) registered legal assistants and law library clerks continue to receive no legal training; (2) prisoners continue to have constitutionally inadequate access to the untrained legal assistants, the untrained library clerks, and the law library itself; and (3) the prison has in fact failed to implement the new library access program. Plaintiff supported his arguments with affidavits based on personal knowledge. Thus, the Court concluded that a factual dispute precluded the granting of defendants' motion.

On August 22, 1988, the Court granted plaintiff's motion for summary judgment. *See* Order of August 22, 1988, supra, page 1318. Again, defendants relied on the mootness argument. The Court rejected defendants argument relying on *Lindquist v. Idaho State Board of Corrections,* 776 F.2d 851, 853–854 (9th Cir.1988) (as a general rule, voluntary cessation of allegedly illegal conduct does not make a case moot). Defendants did not argue that a material factual dispute precluded summary judgment.

First, the Court ruled that prisoners denied physical access to the prison law library must receive assistance from some-

one trained in the law. *Bound v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977) (the fundamental right to access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law).

Second, the Court found that though the prison had instituted regulations that purported to provide inmates with reasonable physical access to the law library during assigned hours, the prison had a history of arbitrarily denying prisoners library access; thus, the Court ruled that the vagueness and arbitrariness of the prison's new regulations failed to insure that inmates would enjoy adequate access.

Third, the Court found that the prison's indigency policy was unacceptable because it forced inmates to choose between purchasing essential hygienic supplies and essential legal supplies. *See Temple v. Ellerthorpe,* 586 F.Supp. 848, 851 (D.R.T.1984).

On December 29, 1988, the Court denied defendants' motion for reconsideration. Once again, defendants repeated their argument that plaintiffs' claims were moot because the new library access policies satisfy constitutional requirements. However, defendants did not assert that conditions had changed or that new law had intervened since the Court's prior rulings. The Court determined that its prior rulings had given sufficient consideration to the issues raised by defendants in the motion for reconsideration.

## V. *Untimely Appeal*

After failing to address the merits of plaintiffs' claims in three substantive motions, defendants continued their diversion tactics by filing an untimely Notice of Appeal after the Court ruled on the summary judgment issues. As the Court explained in an Order dated February 7, 1989, the dispositions of the summary judgment issues did not completely dispose of the case. A remedy was yet to be shaped. The Ninth Circuit's refusal to take jurisdiction, in an Order filed April 20, 1989, amounted

to an acknowledgement of this Court's right to continue exercising jurisdiction. So, the Court moved forward to fashion a remedy.

## VI. *Tentative Injunction*

Creating a remedy proved to be a more difficult task than originally contemplated. On April 13, 1989, the Court set out its tentative injunction to remedy the constitutional deficiencies in the Department of Corrections' policies relating to inmate access to the courts at the Central Unit of the Arizona State Prison Complex in Florence. The Court's lengthy opinion was supported by numerous citations. The Court formulated its view on the basis of plaintiffs' proposed injunction and defendants' objections. Defendants gave no counter-proposal.

Because defendants limited their participation on the record to only objecting to plaintiffs' proposals, the Court recognized that the April 13, 1989 ruling could not be a final judgment. *See* Memorandum and Order of April 13, 1989, at 2 and 22, n. 13. In an effort to bring the case to its conclusion, the April 13, 1989 ruling solicited counter-proposals from the Department of Corrections; the Court gave both plaintiffs and defendants sixty days to suggest modifications that would more efficiently accomplish the goals set out in the opinion. *See id.* at 2, 22, n. 13, and 35–36.

## VII. *Hysteria and Delay*

Instead of practical input to accomplish the goals of the Court's April 13, 1989 ruling, defendants, particularly the head of the Department of Corrections, Sam Lewis, spoke out to the media. In the Court's view, this irresponsible handling of the case by defendants gave rise to harsh press reaction, which included coarse personal attacks on the Court and articles that failed to even faintly reflect the actual proceedings in court.

One of Sam Lewis' press releases apparently indicated that the Department of Corrections had predicted that the cost of the injunction would be as much as six million dollars. *See* Arizona Republic, June 2, 1989, at B1. Yet, the Department of Cor-

rections never presented such information to the Court while in the process of formulating the tentative injunction. In fact, even after the newspaper story had been printed, when defendants' counsel was asked by the Court to present evidence about the six million dollar cost figure, she could not provide specifics. *See* Transcript of June 30, 1989 Hearing, at 36. Defendants' counsel claimed that she had never spoken to Mr. Lewis concerning this lawsuit. *See id.* at 59.

In the courtroom, the 60–day implementation period encountered several delays. Defendants sought an extension of time because the Department of Corrections' liaison to the Attorney General's Office became ill. Additionally, defendants filed several questionable motions, including a motion challenging class counsel's qualifications and a motion to decertify the class. Meanwhile, at every conceivable opportunity, defendants' counsel continued to reassert that the Department of Corrections' new policies were constitutionally sufficient and that the lawsuit was moot.

Such litigation tactics reflect defendants' pattern of conduct throughout this case. Needless to say, little progress was made towards practical modifications to the Court's tentative injunction.

## VIII. *Special Master's Report*

The Court determined that a different approach was needed to bring this case to a satisfactory completion. The adversary system is supposed to strike a balance between two competing interests. Defendants unwillingness to address the merits created a problem. The Court was uneasy about a ruling based solely on plaintiffs' presentation of the evidence. Because defendants never presented information to the Court about conditions at the prison, the Court needed further information to complete the factual record.

The Court decided that appointment of a Special Master/Expert Witness, Dan Pochoda, to investigate and report about how best to accomplish the goal of constitutionally adequate inmate access to the courts, would provide the Court with the complete

factual record needed to enter a final judgment. *See* Order of September 27, 1989.

The Special Master undertook his task in two phases. *See* Order of December 15, 1989. "Direct" and "indirect" access to the prison law library were to be addressed first. "Indigency" would be dealt with at a latter date. With the filing of this Memorandum and accompanying partial final judgment, only "indigency" and related questions remain to be addressed in this litigation.

The Special Master's investigation has clarified the concerns and needs of the parties, and enabled the Court to have a thorough understanding of present operations at the Central Unit in the areas involved in this litigation. *See* Special Master's Report, filed March 12, 1990.

The Special Master reviewed the entire file from the initiation of the case, including all of the testimonial affidavits, exhibits and documents, hearing transcripts, motions and memoranda, and proposed orders and responses. The Special Master spent many hours investigating at the Central Unit. He visited present and proposed law library spaces and conducted interviews of many of the Department of Corrections' administrators and staff. Ten members of the plaintiff class were also interviewed. Counsel for both sides had an opportunity to be present during the interviews. Comprehensive records were kept. Relevant documents and regulations were collected.

As repeatedly emphasized by the Department of Corrections, but never before presented to the Court in a manner warranting consideration, the Special Master's Report acknowledged, for the first time, that personnel and policy changes have now resulted in a different situation than existed at earlier stages of this lawsuit. However, the Court, as well as prison officials (according to the Special Master), recognize that future personnel changes are inevitable and departures from present practices are possible. Thus, at the very least, to prevent the Department of Corrections from slipping back into its old practices, an injunction is necessary—with relief available by petition to the Court if future backsliding occurs.

The Special Master's work in this case has been invaluable. His expertise and understanding of the situation at the Central Unit have given him the ability to sit down and negotiate a permanent injunction that, not only is consistent with the goals of the Court's April 13, 1989 opinion, but is also agreeable to both sides. In fact, at the hearing, on March 29, 1990, defendants only had two objections to the Special Master's proposed injunction. Though given an opportunity, the parties filed no written objections with the Court. The Court addressed defendants' two objections at the hearing. In addition, the Special Master reworded a few phrases to the satisfaction of both sides. The Court, too, is satisfied.

Thus, in the end, despite the difficulties along the way, like many of the class action prisoner cases I have overseen in the past 25 years, the "direct" and "indirect" access aspects of this case have concluded with a solution both sides agree upon—a stipulated injunction.[1]

### IX. *Conclusion*

The Court ADOPTS the Special Master's proposed order. There being no just reason for delay, the order represents a partial final judgment of this matter. *See* Rule 54(b), Fed.R.Civ.P.

### ORDER ON ACCESS TO COURTS

ADOC shall provide meaningful access to the courts for all Central Unit prisoners. The practices and procedures set out below will achieve this constitutional mandate. They concern those areas raised by or necessarily implicated in this litigation and incorporate approaches utilized by Central Unit administrators.

---

1. Defendants have threatened to appeal the Court's ruling on the mootness issue. The Court is hesitant about commenting on a potential appeal. However, in view of the many delays this lawsuit has already encountered and the Court's firm belief that an appeal would frivolously waste judicial resources, the Court encourages the parties to remove their advocacy hats and devote themselves to working out a mutually satisfactory completion of the "indigency" aspect of this case.

# I. THE LAW LIBRARY

ADOC shall maintain an adequate law library and provide sufficient access and assistance to enable prisoners to engage in the basic legal research required for meaningful access to the courts.

## A. *Access*

Central Unit prisoners in all housing areas and custody levels shall be provided regular and comparable visits to the law library. This opportunity may be postponed on an individual basis because of the prisoner's documented inability to use the law library without creating a threat to safety or security, or his physical condition if determined by medical personnel to prevent library use. Upon request, a Central Unit prisoner will be permitted a minimum of ten hours of actual law library use each week; additional time shall be allowed if necessary to meet a filing or other legal deadline.

## B. *Schedule*

The law library shall be open for prisoner use at least twelve hours each day between the hours of 7 a.m. and 10 p.m. A minimum of four turnouts will be scheduled each day. Each turnout must provide prisoners a minimum of two hours of actual library use. Every prisoner should sign the log-book at the law library to indicate the time of arrival at and departure from the library for that turnout; copies of the relevant log-book pages shall be provided to the Special Master on a weekly basis.

## C. *Request Procedure*

Prisoners shall be responsible for selecting their law library turnouts and reducing conflicts with other institutional activities, and for depositing their requests and copies directly in the appropriate receptacles; this requires that ADOC provide timely and adequate information, forms and access to receptacles, as set-out below.

The first library turnout requested by a prisoner must be at least three days after the day the form is deposited; this may be one day if necessary to meet a legal deadline. The week referred to in I(A) begins the day of the first scheduled turnout, and at least ten hours of library use shall be permitted during this seven-day period.

### 1. Information

At least one week prior to the end of each month ADOC shall make known to all prisoners (a) the law library schedule of hours and turnouts for the next month, and (b) the specific schedule of important activities at the Central Unit for the next month, including outside visiting hours, formal classes, religious services, and field turnouts for each housing area; this is not required for those items whose schedule (days and hours) remains the same in the upcoming month.

### 2. Forms

ADOC shall develop law library turnout and legal assistance request forms and have them regularly available in the housing areas and law library for distribution to prisoners. The forms shall provide two tear-off copies, one for retention by the prisoner and one for collection by the Special Master. The law library form should minimally include space for the date submitted and for the selection of specific library turnouts and alternates for up to two weeks, and to detail any filing or other legal deadline. Any such deadline should be verified by relevant documentation identified and possessed by the prisoner or included with the request, or by a description of this information and explanation of why it is not available.

### 3. Receptacles

ADOC shall maintain secure, tamper-resistant receptacles for law library and other legal assistance requests from prisoners. These receptacles must be accessible to prisoners in all housing areas and custody levels at the Central Unit on a daily basis; this minimally requires placement of such a receptacle at both doors to the main dining area. ADOC should develop a method of direct, daily placement in appropriate receptacles of requests and copies from individual prisoners who are unable to use this dining area; this may require additional receptacles.

Next to each receptacle for deposit of prisoner legal assistance requests, ADOC shall place a secure, tamper-resistant receptacle for the contemporaneous deposit of the Special Master's copy of a completed request form. The Special Master will have regular access to these receptacles and responsibility for collection of the copies.

### D. *Response Procedure*

Law library staff or clerks shall collect the original prisoner law library and other legal assistance forms from each deposit point at least once every day. ADOC must develop procedures for scheduling law library turnouts that provide adequate notice and access for all eligible prisoners with preference for those with filing or other legal deadlines, and that insure compliance with this Order.

Denial of a particular turnout may be based on a lack of available library space for that period, or on a finding that the requesting prisoner and a prisoner previously scheduled for that period cannot be together in the library without creating a serious threat to safety or security. If a denial occurs, the prisoner shall be given preference on his remaining requests or a timely opportunity to make additional requests if necessary to meet the weekly ten-hour minimum requirement.

A prisoner shall be provided written notification of his scheduled law library turnouts and of any denied with the reason and factual basis for the denial, and given the opportunity to make additional requests if necessary. This notice must reach the prisoner at least 24 hours before the time of his first requested turnout whether this was granted or denied. Copies of these responses, and of the completed lists of prisoners scheduled for each turnout, will be kept at the law library for collection by the Special Master.

### E. *Law Clerks*

ADOC shall provide a sufficient number of law library prisoner law clerks to permit adequate assistance for prisoners using the library and for those ineligible for such use. This assistance includes providing elementary information about the content and purpose of the books and materials in the library, and about researching specified issues and locating relevant decisions, statutes, regulations and forms. In order to adequately perform this basic function law clerks must successfully complete the legal research course described in II(D) below prior to beginning work; present law clerks may continue but must take this course the first time it is available. In contrast to Legal Assistants, law clerks shall provide guidance to all eligible prisoners, although such guidance is limited in scope and does not extend to the preparation of legal documents for others.

### F. *Conduct*

ADOC may require prisoners to remain in the law library for the full turnout period. After being warned when possible, a prisoner may be involuntarily removed from the library if he continues to create a threat to safety or security, or to directly interfere with others use of the library. Within 48 hours of removal the prisoner must be provided written notice of the reasons and factual basis for this decision, with a copy held for the Special Master. Non-intrusive actions, including reasonable conversations with prisoners or staff, writing or typing, and sitting quietly, are permitted during library turnouts.

### G. *Check-out System*

Individual prisoners who are not able or permitted to visit the law library must be allowed regular and timely access to necessary books and materials. This minimally requires daily exchanges between such prisoners and law library representatives of an adequate amount for research purposes of requested books and materials, or copies, including cases, statutes, annotations, regulations, forms, secondary sources and research guides.

## II. THE LEGAL ASSISTANT PROGRAM

Meaningful access to the courts requires direct assistance for prisoners who because of language factors or lack of access to the

law library, or for other reasons are unable to perform adequate legal research and writing. In the absence of a program providing such prisoners with lawyers or paralegals, ADOC must maintain a sufficient number of at least minimally trained prisoner Legal Assistants.

### A. *Selection*

A prisoner shall become a Legal Assistant by successfully completing the legal research course and being certified by the instructor, and by agreeing to assist prisoners in his custody level and abide by the procedures governing Legal Assistants. Prisoners are eligible for the legal research course if (a) they have a High–School or GED diploma, or (b) pass a basic literacy skills test to the satisfaction of the instructor, or (c) are presently on the Central Unit Legal Assistant list. Persons in this last category may continue, but must take the course when first available.

An otherwise eligible prisoner may be denied Legal Assistant status by the Deputy Warden or a designee because of documented prison behavior indicating that he would create a threat to safety or security in that position; such rejection may not be based solely on a particular custody level or housing area. A prisoner must be provided written notification of a rejection, with the reasons and specific acts involved, and permitted an opportunity to appeal this determination; the notice and response shall be provided to the Special Master.

### B. *Number*

ADOC shall act to insure an adequate minimum number of Legal Assistants for each custody level; there is no maximum. Particular steps must be taken to locate and train bi-lingual prisoners. This minimally requires that schedules and notices relating to Central Unit legal services and programs be made available in Spanish and English.

### C. *Retention*

A Legal Assistant must demonstrate at least minimal competence on a yearly basis, as well as upon the receipt of complaints about his legal work. This may be done by submitting sufficient recent legal writings, including pleadings and memoranda, to the legal research instructor for review. If necessary, the instructor may require that the Legal Assistant complete an exercise or examination from the legal research course for evaluation. A determination by the instructor to remove a prisoner found not minimally competent from the Legal Assistant list must be made in writing with specific reasons and examples, and the relevant work products attached; this shall be provided to the Special Master. Such a prisoner should be reinstated upon compliance with the requirements of II(A) above.

### D. *Research Course*

Within six months of entry of this Order, ADOC shall offer a legal research and writing course for Central Unit prisoners. The Special Master will work directly with persons designated by the ADOC on the development and implementation of this course and report the details to the Court within three months of the Order's entry.

In developing the course the following elements are required: (a) a minimum of sixty hours of instruction provided in a ten-to-twelve week period, with two such courses given each year; (b) a lawyer, law student or trained paralegal instructor with demonstrated experience and ability in teaching and evaluating legal research and writing; (c) a hands-on approach to the needs of Central Unit prisoners, including some sessions in the law library and the rest in a classroom allowing for immediate teacher-student interaction; (d) all sessions videotaped for restricted-movement prisoners; (e) a primary focus on the fundamentals of research and writing, including use of basic reference books and materials, with regular written exercises required and returned with comments during the course; (f) some doctrinal coverage of 42 U.S.C. Section 1983 and other major civil rights statutes, of prison practices including disciplinary and classification measures, of relevant tort law and relevant areas of criminal procedure including appeals, collateral attacks and Habeas Corpus; (g) all Central

Unit prisoners are eligible with classroom preference given to qualifying Legal Assistant and law clerk applicants, and (h) a final evaluation by the instructor based on a student's performance in class and on assignments and examinations, taking into account improvement during the course, as to whether the prisoner is minimally competent to assist others with their legal problems; this certification is not required for those taking the course for other reasons.

### E. Responsibilities

A Legal Assistant should not undertake or continue to assist another prisoner if, because of workload, inexperience, conflict of interest or any other factor, he cannot do so in an effective and timely manner; any such factor may serve as the basis for denying a prisoner's request for assistance. On occasion, a Legal Assistant should be prepared to respond to an institutional request to assist another prisoner or to assess the viability of a legal claim.

Absent the prisoner's permission, a Legal Assistant should not disclose information about the underlying situation or legal plans of a prisoner being assisted. If this is done under the limited circumstance of II(F)(5) below, the resulting conflict of interest minimally requires a reassessment of the relationship with the prisoner being assisted.

### F. Operating Procedures

#### 1. Selecting a Legal Assistant

An updated complete list of Legal Assistants must be regularly available in the law library and housing areas, with all relevant instructions about the Legal Assistant program, including the selection process. An agreement between a prisoner seeking assistance and a Legal Assistant will be registered in the law library after placement of the appropriate form and copy by this prisoner in legal assistance receptacles. Written notification of the registry, or of a denial because of mistake or ineligibility and the opportunity for an alternate selection, shall be provided to the prisoner and to the Legal Assistant within 48 hours of this placement, with a copy held for the Special Master.

A prisoner who is unable to reach agreement with a Legal Assistant, or requires a replacement, may seek institutional intervention by filing a request form and copy in the appropriate receptacles. Upon receipt, law library staff and the Deputy Warden shall act to secure the requested assistance in a timely fashion. The institution will be relieved of this responsibility in a particular matter if two Legal Assistants independently conclude after adequate review that the prisoner's claim is not viable nor capable of redress by formal legal processes; such responses shall be provided to the Special Master.

#### 2. Meetings

A Central Unit prisoner shall request a meeting with his Legal Assistant by use of a legal assistance form and receptacle, with a copy for the Special Master; Legal Assistants may initiate such meetings in the same manner. ADOC must arrange a meeting that occurs within 72 hours of a request, and notify the prisoner and Legal Assistant in writing, with a copy for the Special Master, of the time and place at least 24 hours prior to the meeting. An imminent legal deadline, including a pending disciplinary hearing, noted on a request requires an expedited meeting occurring within 24 hours of the request by a prisoner or Legal Assistant; II(F)(2) does not otherwise apply to assistance provided solely for a pending disciplinary matter.

ADOC must allow a prisoner to meet at least three hours each week with his Legal Assistant; additional time shall be permitted to meet a filing or other legal deadline. Such meetings may occur during law library turnouts; a request by a prisoner or Legal Assistant to have both persons scheduled for a particular turnout shall be given preference. If the library is not requested or available, another location allowing the necessary privacy should be utilized.

#### 3. Library Time

ADOC shall provide Legal Assistants with additional time in the law library com-

mensurate with their obligations to assist other prisoners. In addition to his own hours required by I(A) and (B) above, a Legal Assistant should be allotted two additional turnouts per week, each providing a minimum of two hours of actual library use, for each prisoner that he is registered as assisting. Any such additional turnouts scheduled for a Legal Assistant shall be subtracted from the weekly minimum of the prisoner being assisted. If necessitated by lack of available library space, ADOC may limit such additional turnouts to five in a particular week.

### 4. Supplies and Services

A Legal Assistant may possess and utilize the legal supplies and services available to a prisoner he is registered as assisting solely for purposes relating to this assistance. If this prisoner is indigent, the Legal Assistant will be permitted those free legal supplies and services that are provided to indigent prisoners. These supplies and services must first be requested by the indigent prisoner for delivery to either the Legal Assistant or himself.

### 5. Disclosure

The attorney-client privilege does not attach to the prisoner-Legal Assistant relationship; if prompted by a serious concern of institutional safety or security ADOC may ask a Legal Assistant to reveal information derived from this relationship. Such a request should be limited in scope to this concern and not seek more information than necessary, and shall result in permitting the prisoner to change Legal Assistants in order to be adequately represented and in notice to the Special Master.

Meetings and discussions between a prisoner and his Legal Assistant should not be subjected to intentional or extended eavesdropping. A prisoner shall not be given Legal Assistant status nor assigned to a particular legal assistance matter with the objective of providing information to institutional personnel.

### G. *Other Prisoner Assistance*

Nothing contained herein shall reduce a prisoner's opportunity to consult with any prisoner accessible to him in the Central Unit about a legal matter, nor prohibit any prisoner, consistent with institutional requirements, from providing assistance on legal concerns including court-related matters and institutional proceedings.

### H. *Outside Legal Contacts*

Nothing herein reduces defendants' obligation to facilitate confidential and privileged contacts between Central Unit prisoners and outside lawyers, authorized paralegals, legal organizations, governmental agencies and courts, through regular visits and adequate use of telephones and mails.

## III. LEGAL SERVICES AND SUPPLIES

Meaningful access to the courts requires the availability of basic services and supplies needed for research and writing, and for the preparation and delivery of acceptable court papers.

### A. *Notary Service*

ADOC must provide notary service for legal papers and court related documents within 24 hours of a request by a Central Unit prisoner; this period shall be less if necessary to meet a legal deadline. The request may be made in person during a law library turnout or by use of a legal assistance receptacle.

### B. *Photocopying*

ADOC must provide the necessary copies of eligible legal papers and court related documents within 48 hours of a request by a Central Unit prisoner; this period shall be less if necessary to meet a legal deadline. The request may be made in person during a law library turnout or by use of a legal assistance receptacle. ADOC may charge a reasonable rate for this service, up to five cents per page.

Eligible legal papers and documents include petitions, complaints, answers, motions, affidavits, exhibits, memoranda and briefs, including attachments and appendices, and materials needed for discovery and investigation, including interrogatories and freedom of information requests. ADOC shall advise staff that prisoner legal

materials are confidential and should not be read. Legal materials submitted for copying may be initially examined, but not read, to determine eligibility.

### C. *Typewriters*

Central Unit prisoners may possess typewriters and necessary accessories. ADOC shall also provide an adequate number of functioning typewriters in the law library and other appropriate locations for prisoner use in the preparation of legal papers.

### D. *Supplies*

The Central Unit shall have sufficient quantities of basic legal supplies regularly available for purchase by prisoners. Such supplies minimally include pens, pencils, legal pads, typing paper, typewriter ribbons, ko-rec-type or equivalent, file folders, regular size and manilla envelopes, postage and brief covers and bindings. A reasonable price may be charged for these items, within the departmental guideline of a five-percent above cost maximum mark-up. The prices of all items, legal or otherwise, available for purchase in the Central Unit must be publicized prior to ordering by prisoners. Subject to usual security and search procedures, prisoners may receive any basic legal supplies, books and materials by delivery or mail from outside persons, organizations or businesses.

## IV. IMPLEMENTATION

### A. *Notice*

Plaintiffs may transmit this Order to members of the plaintiff class and may provide ADOC with additional copies that will be kept on reserve in the Central Unit law library and made available to prisoners during library turnouts. The Special Master will provide ADOC with a summary of this Order which shall be made regularly available in the law library and all housing areas; the summary should also indicate the functions of the Special Master.

### B. *Special Master*

Prior Orders concerning the powers, payment and responsibilities of the Special Master, Professor Daniel J. Pochoda, are herein incorporated. Above references to the Special Master include his authorized representatives and assistants.

## MEMORANDUM ON INDIGENCY

On April 27, 1990, the Court issued a memorandum summarizing this litigation and adopting the proposed order of the Special Master, Dan Pochoda, for remedying the Arizona Department of Corrections' (ADOC) problems with "direct" and "indirect" access to the courts for prisoners at the Central Unit in Florence, Arizona. Thus, the only remaining issue to be resolved is how to remedy ADOC's access problems relating to "indigency."

On July 13, 1990, the Special Master filed his second report. This report pertained specifically to indigency.

On July 19, 1990, ADOC responded to the second report. On July 23, 1990, plaintiff responded to the second report. A hearing was held on July 26, 1990, to allow the parties to present oral arguments and put on testimony concerning any discrepancies with the Special Master's findings and proposals. Following the hearing, the parties each presented conclusions of law, which addressed the Court's authority to enter an order consistent with the Special Master's findings and proposals.

On or about August 9, 1990, the Court and the parties received the finalized version of the Special Master's proposed order concerning ADOC's indigency policy. The Special Master was able to work out many of the differences raised by the parties' written objections and raised orally during the hearing.

The Special Master's role in this case has been unique. Because the Court sought an evidentiary basis for shaping a practical remedy, one of the key roles of the Special Master has been his role as an expert witness.

The Special Master's testimony at the July 26, 1990 hearing as well as his two reports are evidence in this case. Though given the opportunity at the July 26, 1990 hearing, ADOC offered no admissible evi-

dence to contradict the Special Master's well based findings and proposals.[1] Without any evidence to support the arguments of ADOC's counsel, this Court has little choice but to follow the practical approach recommended by the Special Master. To do otherwise, would create reversible error.

■ The district court must order effective relief. *Toussaint v. McCarthy*, 801 F.2d 1080, 1087 (9th Cir.1986). Indigent inmates must be provided sufficient legal supplies and services to ensure meaningful access to the courts. *Bounds v. Smith*, 430 U.S. 817, 824, 97 S.Ct. 1491, 1496, 52 L.Ed.2d 72 (1977). ADOC's citation to *Sands v. Lewis*, 886 F.2d 1166 (9th Cir. 1989), does not alter these conclusions.

The instant case is clearly distinguishable from the *Sands* case.[2] On the one hand, the *Sands* case was a single issue *pro se* prisoner civil rights case in which the prisoner did not show how the prison's confiscation of his typewriter caused a particular injury. The Ninth Circuit ruled that, in the absence of a particular injury, Mr. Sands failed to state a constitutional claim for violation of his right to access the courts. On the other hand, the instant case is a major class action suit brought by the A.S.U. Legal Clinic on behalf of all central unit prisoners.[3] By this late stage, evidence of specific injuries to class members has thoroughly been documented in the official file of this lengthy case.

■ Moreover, ADOC's argument that prisoners have no constitutional right to the use of typewriters is irrelevant to this case. ADOC already provides central unit prisoners access to typewriters. This practice promotes efficient use of judicial resources and benefits all involved in the litigation process, including ADOC's counsel. The issue of whether ADOC must provide typewriters to prisoners is not before the Court. It will suffice to say that requiring ADOC to supply typewriter related supplies as part of minimum legal supplies for indigent prisoners is reasonable under the circumstance presented in this case.

Finally, the Court notes that rulings in other jurisdictions suggest that inmates should not be forced to forego the purchase of hygiene supplies and basic amenities in order to obtain sufficient supplies to research, prepare and file court documents. *Souder v. McGuire*, 516 F.2d 820, 824 (3rd Cir.1975); *Temple v. Ellerthorpe*, 586 F.Supp. 848, 850–52 (D.R.I.1984). The current problems with ADOC's indigency policy needs to be corrected. The Special Master's proposed order is a well supported practical solution for correcting the problems.

The Court ADOPTS the Special Master's second report as its findings of fact. Furthermore, based on the second report and the conclusions of law stated in this memorandum, the Court ADOPTS the Special Master's proposed order concerning ADOC's indigency policy. IT IS ORDERED that plaintiff shall file a proposed form of judgment in conformance with this ruling.

## ORDER ON LEGAL SUPPLIES AND SERVICES

■ ADOC shall provide meaningful access to the courts for all Central Unit prisoners. This constitutional requirement must not be conditioned on a prisoner's ability to pay. The practices and procedures set out below will provide all prison-

---

1. ADOC did attempt to provide the Court with one piece of evidence to contradict the Special Master's findings. On July 24, 1990, ADOC filed a Supplement to Defendants' Response to the Second Report and Proposed Order of the Special Master. The supplementation consisted of a document prepared by a Law Library Supervisor, CSO II Woods, which addresses the Special Master's report. This document is inadmissible because it is hearsay and contains speculation without proper foundation.

2. In fact, when Mr. Sands attempted to intervene in the instant case by filing a Motion for Temporary Restraining Order with the *Gluth* caption, the Court denied his motion. *See* Order dated January 6, 1989.

3. In *Sands*, the Ninth Circuit said that no "actual injury" must be alleged if one of the core requirements under *Bounds* is involved. *Sands*, 886 F.2d at 1171. Unlike *Sands*, a core requirement under *Bounds* has been at issue in this case—adequacy of legal assistance.

ers the requisite access to basic legal services and supplies needed for research and writing, and for the preparation and delivery of acceptable court papers, as ordered by this Court on April 25, 1990.

## I. Eligibility

Subject to the requirements contained herein, a prisoner shall be provided basic legal supplies and services at ADOC expense if (a) he has less than $46.00 in his prison account on the date of the request, and (b) there have been less than $46.00 in total deposits to his account in the 28–day period ending on the date of the request. A prisoner who meets (a) but not (b) shall be provided those specific supplies and services required to meet an imminent and documented legal deadline, and a written statement of the costs of these. If this occurs, ADOC may, with written notice to the prisoner, debit the prisoner's account whenever and to the extent that his balance exceeds $46.00 until the cost of the emergency items is repaid.

ADOC shall regularly adjust the above cut-off figure in order to adequately insure a prisoner's access to basic legal supplies and services without sacrificing basic hygiene needs. This adjustment shall occur at least every twenty-four months beginning the date of entry of this Order. It shall minimally be the percent change in the U.S. Consumer Price Index for the previous twenty-four months multiplied by the existing cut-off figure. The resulting new cut-off figure shall be rounded to the nearest fifty-cents.

## II. Supplies and Services

### A. *Supplies*

Upon request the following supplies shall be provided to eligible prisoners; the numbers in parentheses indicate the minimum amount of the item that must be provided for one week: pens (2), pencils (2), legal pad (1), typing paper (10 sheets), typewriter ribbons (1), ko-rec-type or equivalent (1), file folders (3), regular envelopes (5) and manila envelopes (3). Brief covers and bindings and additional amounts of the above supplies shall be provided if necessary to meet a court deadline or requirement.

ADOC may require that the requesting prisoner check the specific items needed for legal research or preparation of legal papers during the next week. Pursuant to the April 25, 1990 Order, Section II(F)(4), the prisoner should indicate which, if any, of the supplies should be delivered directly to his legal assistant for work on his case.

### B. *Postage*

Postage shall be provided for all legal mail for eligible prisoners. Legal mail includes letters and documents sent to a court, to an attorney, to a legal agency or organization or to a pro se opposing party.

### C. *Photocopying*

Eligible prisoners shall be provided the necessary copies of legal papers and court related documents as described in Section II(B) of this Court's April 25, 1990 Order. All legal materials are confidential; those submitted for copying may be initially examined but not read, to determine eligibility. The prisoner shall minimally be provided with the number of copies of a document required by the court, plus one copy for the opposing party and one for his records.

## III. Request Procedure

The request procedures and forms, including the use of the receptacle with a copy for the Special–Master, shall comply with the applicable requirements of Section I(C) of the April 25, 1990 Order. The request may be completed and delivered in person during a law library turnout or placed in the appropriate receptacles. The prisoner should indicate that to his knowledge he meets the eligibility requirements, which supplies and services are required for the next week, and which should go to his legal assistant.

## IV. Response Procedure

Law library staff or clerks shall collect the original prisoner request forms from each deposit point at least once each day.

ADOC shall deliver the requested supplies or services to an eligible prisoner or designated legal assistant within 48 hours of the request; this period shall be less if necessary to meet a legal deadline. A prisoner shall be provided written notification of a denial of all or part of his request, with the specific reasons and factual basis, within 48 hours of the request; a copy shall go to the Special Master. If required by the closing of the Business Office on Saturday and Sunday, processing of a request submitted on Friday, Saturday or Sunday may be delayed until the following Monday.

V. Implementation

Section IV of the April 25, 1990 Order is herein incorporated.