Fletcher CASEY, et al., Plaintiffs,

v.

Samuel A. LEWIS, et al., Defendants.

Nos. CIV 90–0054 PHX CAM,
CIV 91–1808 PHX CAM.

United States District Court,
D. Arizona.

Nov. 13, 1992.

Alice Loeb Bendheim, Phoenix, AZ, and Adjoa A. Aiyetoro, Stuart Henry Adams, Jr., and David Cyrus Fathi, Nat. Prison Project of America, Civ. Liberties Union Foundation, Washington, DC, for plaintiffs.

Kathleen L. Weinecke and Daniel Struck, Jones, Skelton & Hochuli, Phoenix, AZ, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ACCESS TO THE COURTS

MUECKE, District Judge.

Having considered the evidence presented by the parties in this matter regarding the access to the courts issues, the Court concludes as follows:

### *FINDINGS OF FACT*

**I. Access to the Courts**

**A. Physical Access without access to legal materials**

In a number of facilities, prisoners allowed physical access to the law library are not allowed to browse the shelves. In some facilities, general population prisoners are denied access to the shelves although they are allowed physical access to the law library. Therefore, they must request legal materials from untrained prisoner law clerks or security officers.[1]

Inmates may browse the shelves in the law library at the Rynning unit law library at Florence;[2] the Florence women's unit;[3]

---

1. Stipulation, 11/15/1991 (hereinafter "Stip."), p. 8, 6d (South unit at Florence); p. 9, 7c (Alhambra); p. 11, 9e (Kaibab unit at Winslow); p. 12, 10e (Coronado unit at Winslow); p. 13, 11e (San Juan unit at Perryville); p. 14, 12a (Santa Cruz unit at Perryville); p. 18, B.

2. Doe I testimony, 12/17/1991, p. 253, lines 19–22.

3. McQuillen testimony, 12/19/1991, p. 133, lines 16–18.

Tucson;[4] the Mohave unit and the Gila unit at Douglas.[5] None of the inmates have access to the stacks at any of the law libraries at Perryville[6] or the Kaibab unit at Winslow.[7]

Two lockdown facilities in Florence, SMU and CB–6, have developed "cages" that allow prisoners to sit in the law library area but prevent them from browsing the shelves.[8] Prisoners in the "cages" at CB6 and SMU must request legal materials from an untrained law clerk.[9]

Defendants argue that vandalism problems justify denial of access to the stacks. Defendants establish that vandalism occurred to legal materials in the Perryville complex.[10] However, it is not clear that this vandalism occurred because of access to the shelves. In certain facilities where prisoners have been allowed to browse the shelves, legal materials have not been stolen or damaged.[11] Further, there is no evidence that allowing prisoners to browse the law library shelves is the cause of missing or damaged legal materials.[12] Rather, the evidence suggests that inadequate staffing may be the cause of missing or damaged legal materials.[13]

## B. Denial of Physical Access to the Law Libraries

Lockdown prisoners are routinely denied physical access to the law library. Prisoners in lockdown status in most facilities have no physical access to the law library.[14] In order for lockdown prisoners who are denied physical access to the law library to obtain legal materials or a legal assistant, they must send a written request ("kite") to the law library. The legal materials, if available, are sent to the prisoner in his/her lockdown cell.[15] Legal materials are brought to the prisoner in lockdown by ADOC staff, a prisoner legal assistant, or a prisoner law clerk.[16]

Staffing, logistics, and the reluctance to mix general population prisoners with lockdown prisoners are the reasons lockdown prisoners are generally denied physical access to the law library.[17] However, despite these same concerns, prisoners in lockdown in the Rynning unit and the Women's Division in Florence are allowed physical access to the law library and are allowed to browse the shelves.[18]

Prisoners in lockdown experience severe interference with their access to the courts. Unless a lockdown prisoner has a pending ADOC charge or outside ("street") case pending, the prisoner is denied access to a legal assistant.[19] Prisoners who are in lock-

---

4. Joyner testimony, 1/15/1992, p. 111, lines 3–7.

5. Stip., p. 10, 8e.

6. 1/7/1992, p. 94, lines 21–23.

7. Ori testimony, 1/15/1992, p. 144, lines 12–21.

8. Bishop testimony, 12/17/1991, p. 144, lines 24–25, p. 145, lines 1–10; Tyszkiewicz testimony, 1/7/1992, p. 154, lines 17–24.

9. Stip., p. 2, 1d, p. 4, e; p. 18, B.

10. Cathcart testimony, 1/7/1992, p. 94, lines 21–25, p. 95, lines 1–4, p. 95, lines 10–25, p. 96, lines 1–16; Defendants' Exhibit 834, p. 1–3.

11. Stip., p. 17, 15b; Joyner dep., p. 34, lines 14–21; Joyner testimony, 1/15/1992, p. 111, lines 3–7; Doe I testimony, 12/17/1991, p. 254, lines 1–3.

12. Keeney dep., p. 80, lines 3–6.

13. Exh. 217, p. 26.

14. Keeney testimony, 1/27/1992, p. 39, lines 2–7; Wilber testimony, 11/22/1991, p. 122, lines 11–

25, p. 23, lines 1–11; *see also* Stip., p. 6, 4e; p. 10, 8d; p. 11, 9f; p. 14, 12c; p. 15, 13d; p. 16 14e; Joyner dep., p. 7, lines 23–25; Exh. 217, p. 38; Exh. 248ca.

15. Keeney testimony, 1/27/1992, p. 39, lines 2–7; Wilber testimony, 11/22/1991, p. 122, lines 18–25; Exh. 248ca; Exh. 201; Stip., .6, 4e; p. 10, 8d; p. 11, 9f; p. 14, 12c; p. 15, 13d; p. 16, 14e; p. 21, 8b, 9b; Exh. 216, p. 3, 6. 2.4.

16. Wilber testimony, 11/22/1991, p. 124, lines 14–18; Stip., p. 14, 12c; p. 18, b; Exh. 201; Exh. 216, p. 2, 6.1.10.

17. Keeney testimony, 1/27/1992, p. 39, lines 10–25, p. 40, lines 1–3.

18. Stip., p. 5, 3d; Doe I testimony, 12/17/1991, p. 253, lines 19–20; Powell testimony, 1/7/1992, p. 266, lines 11–13.

19. McQuillen testimony, 12/19/1991, p. 130, lines 6–11; Booker testimony, 12/18/1991, p. 273, lines 20–25; p. 274, line 1; Exh. 40y.

down status for less than fifteen days may be denied any access to the law library.[20] For example, prisoners who are in lockdown in Perryville are by policy not eligible to request legal materials unless they have been in lockdown for more than fourteen days.[21] In many instances, prisoners in lockdown are denied law books unless they can provide an exact citation.[22]

Prisoners in lockdown routinely experience long delays in receiving legal materials or legal assistance. At Perryville, it can take several days, even weeks, for a request for legal material to get to the law library and be filled.[23] At Tucson, lockdown prisoners may wait as long as three to seven days to receive legal materials from the law library.[24] At Tucson, lockdown prisoners experience delays in receiving legal assistance from legal assistants.[25] Legal assistants are only sent to the lockdown unit on Monday, Wednesday and Friday nights.[26] At Winslow, it can take a week for a request for legal assistance to reach a legal assistant.[27] Legal assistants at Winslow are allowed to visit lockdown prisoners only four days a week.[28] At Douglas, lockdown prisoners are denied access to legal materials and legal assistants on Fridays and Saturdays.[29]

Prisoners in lockdown are restricted in the numbers of books they can receive and the length of time they can keep the material. It has been the practice at Perryville to allow prisoners to receive only one book at a time, to be kept for only twenty-four hours.[30] Lockdown prisoners at Tucson are allowed to keep legal materials for only twenty-four hours. Because of this restriction, they tend to request only one or two books at a time.[31] Even lockdown prisoners who are intelligent,

20. Exh. 794, p. 2, 5.1.5.

21. Cathcart dep., p. 31, lines 6–13.

22. Booker testimony, 12/18/1991, p. 270, lines 12–25, p. 271, lines 1–4; Exh. 249ji, Cathcart memo; Exh. 249kd, Cathcart memo; Joyner dep., p. 38, lines 17–19; Wilber testimony, 11/22/1991, p. 124, lines 1–6; Bishop testimony, 12/17/1991, p. 145, lines 19–25, Bartholic testimony, 12/17/1991, p. 200, lines 11–25, p. 201, lines 1–7; Exh. 19fff; Sloboda dep., p. 33, lines 9–18, *but see* Sloboda's contradictory testimony at trial: Sloboda testimony, 1/14/92, p. 107, lines 19–25, p. 108, lines 1–3.

23. Cathcart dep., p. 27, line 25; p. 28, lines 1–5; Exh. 249ja, (waited four days to receive 5 A.R.S.); Exh. 249iz (waited eight days to receive 462 F.Supp.); Exh. 249jc (waited six days to receive 477 F.Supp.); Exh. 249jd (waited five days to receive 94 S.Ct.); Exh. 249jb (waited five days to receive 96 S.Ct.); Exh. 249je (waited nine days to receive 5 A.R.S.); Exh. 249jf (waited nine days to receive one volume of 42 USCA §§ 1983–1984); Exh. 249jj (waited six days to receive 142 Az.2d); Exh. 249jk (waited three days for 15 Az.2d); Exh. 249jl (waited three days for 5 A.R.S.); Exh. 249jm (waited three days to receive 11 A.R.S.); Exh. 249jq (waited three days to receive 5 A.R.S. and a copy of Adm. Rules); Exh. 249jr, (waited nine days to receive material on post-conviction remedies, three days after second request); Exh. 249js (waited ten days for 406 F.2d); Exh. 249ju (waited eleven days for Federal Civil Judicial Procedure and Rules); Exh. 249jw (waited thirteen days for 387 F.Supp. and sixteen days for 655 F.2d 487); Exh. 249jy (waited seven days to receive 104 Ariz.2d); Exh. 249kd (waited thirteen days to receive 154 Ariz.); Exh. 249ki (waited ten days for the Yellow Pages and the Zip Code book); Exh 249kl (waited eleven days to receive volumes 827 and 697 of F.2d); Exh. 249iu (waited three days to receive a response to his request); Exh. 249iv (waited three days to receive 84 Federal Practice Digest 3rd); Exh. 249iw (waited nine days to receive 1989 Supplement to Rights of Prisoners).

24. Joyner testimony, 1/15/1992, p. 107, lines 21–25, p. 108, lines 1–6; Exh. 40b (waited four days to receive legal materials); Exh. 40c waited seven days to receive copies of three cases); Exh. 40d (waited three days or longer to receive a disciplinary rule book); Exh. 40s (waited four and six days, respectively, for legal materials); Exh. 40b (waited four days for legal materials).

25. Exh. 40t (waited seven days for a visit from a legal assistant); Exh. 40v (received no response to his request to see a legal assistant); Exh. 40w (waited four days to receive a visit from a legal assistant); Exh. 40e (waited four days to receive a visit from a legal assistant).

26. Joyner testimony, 1/15/1992, p. 108, line 1.

27. Johns testimony, 12/18/1991, p. 102, lines 125.

28. Exh. 255cx.

29. Exh. 205.

30. Cathcart dep., p. 29, lines 24–25, p. 34, lines 7–16; Exh. 249iw (Rights of Prisoners); Exh. 249jc; Exh. 49jo.

31. Joyner testimony, 1/15/1992, p. 109, lines 20–25, p. 110, lines 4–12).

literate and legally trained are unable to do legal research under paging system that allows only one or two books at a time every couple of days. In addition, the legal assistants assigned to lockdown prisoners are not sufficiently skilled to assist them.[32]

The vast majority of adult prisoners incarcerated by ADOC have no adequate means to research the law, crystalize their issues, present their papers in a meaningful fashion, and get them filed in court.[33]

## C. Illiterate or Non–English Speaking Prisoners

There are prisoners within ADOC custody who are functionally illiterate and who do not have English as their primary language. During a six month period between October 1990 and March 1991, 3,253 prisoners were tested at the reception center. Of these prisoners, 17.2% had a reading level below sixth grade and 14.5% were non-English speaking.[34] A system-wide study conducted in 1989 established that 35% of the adult incarcerated population had a reading level of seventh grade or below.[35] The trial testimony supported the conclusions of the studies and indicated that there are prisoners who are unable to research the law because of their functional illiteracy or lack of English skills.[36]

As a result of the inability to receive adequate legal assistance, prisoners who are slow readers have had their cases dismissed with prejudice.[37] Other prisoners have been unable to file legal actions.[38]

## D. Staffing

Many of the law libraries are staffed by security staff and prisoner law clerks.[39] In Tucson, there are seven legal assistants at the Santa Rita unit;[40] two clerks and thirteen legal assistants at the Cimarron unit; one clerk and one legal assistant at the Echo law library; and five law clerks and five legal assistants at the Rincon law library.[41]

In Florence, the law library at CB–6 has four prisoner law clerks and three legal assistants;[42] the SMU library has three law clerks, eleven legal assistants, and one correctional security officer;[43] the East unit law library is staffed by one correctional security officer and two law clerks and has seven legal assistants;[44] the North unit library is staffed by a correctional security officer, two law clerks and one legal assistant;[45] and the law library at the South unit is staffed by a correctional security officer, three law clerks and nine legal assistants.[46] The law library at Alhambra is staffed only by two law clerks

---

**32.** Wilber testimony, 11/22/1991, p. 124, lines 6–13, 25, p. 125, lines 1–22; McQuillen testimony, 12/19/1991, p. 131, lines 10–15.

**33.** Wilber testimony, 11/22/1991, p. 109, lines 14–25.

**34.** Exh. 835.

**35.** Exh. 272.

**36.** Wilber testimony, 11/22/1991, p. 114, lines 12–25, p. 115, lines 1–9, p. 178, lines 1–5, p. 199, lines 3–5; McQuillen testimony, 12/169/1991, p. 115, lines 16–25, p. 116, lines 8–25, p. 133, lines 8–15; p. 128, lines 1–6; Bishop testimony, 12/17/1991, p. 117, lines 13–25, p. 118, Lines 1–25, p. 119, lines 1–11; Harris testimony, 12/18/1991, p. 218, lines 19–25, p. 246, lines 1–5; Tyszkiewicz testimony, 1/7/1992, p. 169, lines 16–20, p. 170, lines 1–18; Friego testimony, 1/9/1992, p. 76, lines 8–14, p. 79, lines 11–13, lines 21–23.

**37.** Bartholic testimony, 12/17/1991, p. 198, lines 16–25, p. 200, lines 11–25, p. 201, lines 1–9; Exh. 956.

**38.** Harris testimony, 12/18/1991, p. 218, lines 8–20.

**39.** Stip., p. 18, B; p. 10, 4a, 5a, 6a, 6b, 7a and 7b; Exh. 217, pp. 25, 43, 49, 65 and 67A; Keeney testimony, 1/27/1992, p. 68, lines 15–25, p. 69, lines 1–4, p. 26, lines 3–8, lines 12–17, p. 34, lines 9–22.

**40.** Joyner testimony, 1/15/1992, p. 100, lines 5–6.

**41.** Joyner testimony, 1/15/1992, at p. 101, lines 7–11.

**42.** Stip., p. 18, B1a and b.

**43.** Stip., p. 19, B2a,b and c.

**44.** Stip., p. 20, B4a and b.

**45.** Stip., p. 20, B5a and b.

**46.** Stip., p. 20, B6a and b.

and two legal assistants.[47]

The law library at Mohave unit at Douglas is staffed by a civilian librarian and three law clerks.[48]

The law library at the Kaibab unit at Winslow is staffed by a civilian librarian, Sue Ori, and three law clerks.[49] There are five legal assistants but only two are approved to deliver legal materials to lockdown units.[50] The law library at the Coronado unit at Winslow is staffed by civilian librarians and two law clerks. There are four legal assistants.[51]

All the library officers at the law libraries at Perryville are assisted by the librarian at the complex law library.[52] The head law librarian at ASPC–Perryville, Starla Cathcart, has a master of library science from Brigham Young University.[53] The library at the San Juan unit at Perryville is staffed by three law clerks, a correctional security officer and a librarian.[54] The law library at the Santa Cruz unit at Perryville is staffed by a correctional security officer, two law clerks and one bilingual aide.[55] The law library at the Santa Maria unit at Perryville is staffed by three prisoner law clerks and a correctional security officer. There is one approved legal assistant for general population and one for lockdown prisoners.[56] The law library at the San Pedro unit at Perryville is staffed by one correctional security officer and three law clerks. There are two approved legal assistants for disciplinary actions.[57]

The law library at the Arizona Center for Women at Phoenix is staffed by two law clerks and one Department of Corrections employee. There are two approved legal assistants.[58]

In Tucson, Bill Streit is the complex librarian.[59] The law library at the Santa Rita unit is staffed by a law librarian and three inmate clerks.[60] Ann Joyner, the law librarian at the Santa Cruz Unit at Tucson, has a Master's degree in Library Science from the University of Arizona, and a Bachelor's degree from the University of Florida.[61] The Echo Unit and the Rincon Unit law libraries have full-time law librarians.[62]

The prisoner legal assistants, law clerks, and civilian library staff are responsible for providing legal services to all prisoners in the facilities. However, law clerks and library staff can assist prisoners only by giving them the requested material from the law library stacks, whereas legal assistants can help them draft pleadings and do other legal work.[63] There are an insufficient number of legal assistants available to assist prisoners who need legal assistance.[64]

47. Stip., p. 20, B7a and b.

48. Stip., p. 21, B8a.

49. Ori testimony, 1/15/1992, p. 142, lines 11–15.

50. Stip., p. 21, B9a and b.

51. Stip., p. 22, B10a and b.

52. Cathcart testimony, 1/7/1992, p. 90, lines 15–24.

53. Cathcart testimony, 1/7/1992, p. 79, lines 16–25, p. 80, lines 1–16.

54. Stip., p. 22, B11a and b.

55. Stip., p. 22, B12a and b.

56. Stip., p. 23, B13a and b.

57. Stip., p. 23, B14a and b.

58. Stip., p. 23, B15a and b.

59. Joyner testimony, 1/15/1992 p. 96, lines 7–9.

60. Joyner testimony, 1/15/1992, p. 99, lines 11–15.

61. Joyner testimony, 1/15/1992, p. 94, lines 1–8.

62. Joyner testimony, 1/15/1992, p. 100, lines 17–25, p. 101, lines 1–3).

63. Wilber testimony, 11/22/1991, p. 152, lines 8–16; Exh. 216 (ADC Internal Management Policy 302.11), p. 1, 5.2, p. 8, 6.12.1.3; Cathcart testimony, 1/7/1992, p. 115, line 25, p. 116, lines 1–3; Joyner testimony, 1/15/1992, p. 114, lines 17–20.

64. Doe I testimony, 12/17/1991, p. 258, lines 13–25, p. 259, lines 1–10; Stip., p. 20, 5b; Johns testimony, 12/18/1992, p. 103, lines 24–25, p. 104, lines 1–7; Exh. 250c; Exh. 250p; McQuillen testimony, 12/19/1991, p. 123, lines 2–4, p.

ADOC recognizes a need for additional librarians, but requests for additional staff have been rejected.[65] There is a specific need for more library staff to assist in providing library services to prisoners in lockdown at the Perryville facility.[66]

ADOC does not ensure that the law libraries or facilities have Spanish-speaking legal assistants or law clerks.[67] In many facilities there are no Spanish-speaking legal assistants or law clerks.[68] The Gila unit at Douglas; Santa Rita Unit at Tucson; CB–6 at Florence; Mohave Unit at Douglas; and the Coronado Unit at Winslow each have one bilingual law clerk.[69]

At the South Unit law library at Florence there is one bilingual law clerk/legal assistant.[70] At the San Juan Unit law library at ASPC–Perryville, two of the law clerks speak Spanish.[71]

Most of the prisoners must rely on Spanish-speaking prisoners who are not law clerks or legal assistants to assist them and their legal assistants.[72] However, frequently these prisoners are unable to comprehend and translate legal terminology.[73]

## E. Training of staff and inmates

### 1. Qualifications for inmate legal assistants

In most facilities prisoners apply to the warden to become legal assistants.[74] These prisoners are not required to meet any specific knowledge or performance requirements pertaining to legal research prior to being approved for the legal assistant position.[75] Perryville and the Santa Rita Unit at Tucson are the only facilities that have developed tests for prisoners seeking to be law clerks.[76] However, the tests are not given to all prisoners who apply to be law clerks[77] and evaluate only the prisoner's knowledge of the library collection but do not test actual research skills, legal analysis and legal writing.[78]

### 2. Training for inmate legal assistants

The legal assistants and law clerks frequently are not sufficiently skilled to provide prisoners adequate legal services.[79] ADOC has no training program for prisoners or civilians who provide legal services, with the exception of the court-ordered training in the

124, lines 10–19; Bishop testimony, 12/17/1991, p. 111, lines 1–7.

65. Keeney dep., p. 69, lines 15–25, p. 70, line 1; Lewis dep., p. 26, lines 3–8.

66. Cathcart dep., p. 69, lines 16–20; Cathcart testimony, 1/7/1992, p. 114, lines 7–17.

67. Friego testimony, 1/9/1992, p. 81, lines 24–25, p. 82, line 1; Joyner testimony, 1/15/1992, p. 120, lines 1–13.

68. Johns testimony, 12/18/1991, p. 105, lines 23–25; p. 106, lines 1–11; Friego testimony, 1/9/1992, p. 75, lines 21–22; Joyner testimony, 1/15/1992, p. 100, lines 5–16; Cathcart dep., p. 13, lines 1–4; McQuillen testimony, 12/19/1991, p. 115, lines 11–12; Stip., p. 19, 3c; p. 21, 9b; p. 22, 11a and 11b; p. 23, 13a, 13b, 14a and 14b; Exh. 250c; Exh. 40t.

69. McQuillen testimony, 12/19/1991, p. 114, lines 12–16, p. 115, lines 1–10; Sloboda testimony, 1/14/1992, p. 92, lines 3–7, lines 13–15; Joyner testimony, 1/15/1992, p. 100, lines 7–16; Stip., p. 21, B8a, p. 22, B10a.

70. Stip., p. 20, B6b.

71. Stip., p. 22, B11a.

72. Friego testimony, 1/9/1992, p. 82, lines 5–19; McQuillen testimony, 12/19/1991 p. 115, lines 16–21; Stip., p. 19, 3c.

73. McQuillen testimony, 12/19/1991, p. 115, lines 16–25, p. 116, lines 1–3.

74. Exh. 216, p. 6, 6.9.4.

75. Exh. 790, Policy Receipt Newsletter, dated 3/14/91, p. 1, 5.3.

76. Cathcart testimony, 1/7/1992, p. 90, Line 25, p. 91, lines 1–2; Joyner testimony, 1/15/1992, p. 101, lines 20–25, p. 102, Lines 1–11.

77. Cathcart dep., p. 21, lines 14–23; Joyner testimony, 1/15/1992, p. 112, lines 9–11, p. 113, lines 1–4.

78. Joyner testimony, 1/15/1992, p. 113, lines 12–18; Cathcart testimony, 1/7/1992, p. 94, lines 8–11.

79. McQuillen testimony, 12/19/1991, p. 128, lines 1–7, p. 129, lines 4–15; Tyszkiewicz testimony, 1/7/1992, p. 185, lines 10–20; Bishop testimony, 12/17/1991, p. 117, lines 13–25, p. 118, lines 1–25, p. 148, lines 17–19; Johns testimony, 12/18/1991, p. 105, lines 7–22; Cathcart testimony, 1/7/1992, p. 108, lines 1–11; Wilber testimony, 11/22/1991 p. 155, lines 3–9; Exh. 217, p. 50.

Florence Central Unit [*Gluth* ] and a training program that was developed in July 1990 at the Complex law library in Tucson, a program that has not been implemented in all the units in Tucson.[80] Inmate legal assistants at Tucson were provided an eighteen and a half hour training program by the Department of Corrections.[81] Some of the inmate legal assistants at SMU in Florence have gone through the legal training program offered at the Central Unit pursuant to the *Gluth* decision.[82] After the filing of this lawsuit, ADOC promulgated a plan to provide law clerks and legal assistants training in the law, but later rescinded the policy.[83]

Paralegal courses are available for inmates through correspondence or closed circuit television.[84] Although some law clerks or legal assistants have taken a paralegal correspondence course, there is no system in place to evaluate their work.[85]

Law clerks and legal assistants should be required to take a training course that includes classroom hours in legal research and courses in the substantive law relevant to prisoners' needs, such as the disciplinary process, warrants, detainers, collateral attacks and civil procedure.[86] Thus, the eighteen-and-a-half-hour training program provided certain legal assistants in Tucson is insufficient training.[87]

### 3. Qualifications and training for staff

In order for library staff to provide prisoners with adequate law library services, all of the library staff must be trained in the law.[88] There is no training provided civilian or security library staff other than that provided in the Central Unit pursuant to *Gluth*.[89] Although some librarians have training in library science, this is not a requirement. Also, staff is not required to have training in legal research.[90]

### F. Contents of the law libraries

The defendants do not assure that library inventories are updated and self-help manuals and other needed legal materials are available to prisoners. There is no one in ADOC who is responsible for monitoring law libraries statewide.[91]

The standard library collection that would comply with the "Muecke List" contains at least the United States Code Annotated; Supreme Court Reporter; Federal Reporter Second; Federal Supplements; Shepards U.S. Citations; Shepards Federal Citations; Local Rules for the Federal District Court; Modern Federal Practice Digests; Federal Practice Digest (Second); Arizona Code Annotated; Arizona Reports; Shepards Arizona Citations; Arizona Appeals Reports; Arizona Law-of Evidence (Udall); ADC Policy Manu-

**80.** Keeney dep., p. 77, lines 12–14, lines 22–214; McQuillen testimony, 12/19/1991, p. 113, lines 7–16, p. 120, lines 21–23; Booker testimony, 12/18/1991, p. 282, lines 11–19; Doe I testimony, 12/17/1991, p. 253, lines 2–4, Cathcart testimony, 1/7/1992, p. 108, lines 1–11; Joyner testimony, 1/15/1992, p. 101, lines 23–25, p. 102, lines 1–25, p. 103, lines 1–11,· p. 112, lines 9–25, p. 113, lines 1–9, p. 120, lines 3–6; Friego testimony, 1/9/1992, p. 79, lines 6–10; Stip., p. 18, B; p. 12, 9.G; Exh. 200.

**81.** Wilber testimony, 11/22/1991, p. 184, lines 4–5, lines 14–18, p. 185, lines 11–12.

**82.** Tyszklewicz testimony, 1/7/1992, p. 184, lines 20–25, p. 185, lines 1–4.

**83.** Lewis dep., p. 66, lines 19–23; Keeney dep., p. 86, lines 4–19; Exh. 50, Executive Staff Meeting Minutes, 6/25/90, p. 4; 7/16/90, p. 2; Exh. 216, 5.3; Exh. 785 5.5.3. and 6.9.2; Exh. 790, Policy Receipt Newsletter, #91–16, dated 3/14/91, p. 1.

**84.** Tyszkiewicz testimony, 1/7/1992, p. 185, lines 13–14, p. 186, lines 20–21.

**85.** Friego testimony, 1/9/1992, p. 79, lines 7–10; Joyner testimony, 1/15/1992, p. 120, lines 3–6.

**86.** Wilber testimony, 11/22/1991, p. 153, lines 19–25, p. 154, lines 1–9.

**87.** Wilber testimony, 11/22/1991, p. 197, lines 3–·11.

**88.** Exh. 217, p. 25, pp. 26–27, p. 35 2, p. 50, p. 51, p. 54 2, p. 55, p. 67.

**89.** Powell testimony, 1/7/1992, p. 268, lines 17–25, p. 269, lines 1–4; Exh. 217, p. 26–27.

**90.** Keeney testimony, 1/27/1992, p. 33, lines 12–19, p. 68, lines 15–25, p. 69, lines 1–4; Exh. 217, p. 25.

**91.** Keeney dep., p. 83, lines 13–19; Cathcart dep., p. 11, lines 9–14.

al; 108 Institutional Management Procedures; Federal Practice and Procedure (Wright); Corpus Juris Secundum and Arizona Digest. (Defendants' Exhibit 785, p. 1; see also, *Wilkinson v. MacDougall*, CIV 81-1397, (Jan. 5, 1984)).

Although defendants now have the "Muecke list"[92] in most the law libraries statewide, a number of libraries had volumes that were not updated.[93] In the Alhambra law library, there was no Shephard's United States Citations 1991 supplement.[94] In the CB-6 law library, Corpus Juris Secundum was missing pocket parts in various volumes.[95] In the ACW law library, Federal Practice Digest 3rd and the Arizona Law of Evidence were not current.[96] At the Santa Maria law library, the Modern Federal Practice Digest was unavailable.[97] The defendants opened the Rynning Unit in May 1991, but by December 16, 1991 they still did not have certain books required by the *Muecke* list.[98]

Prisoners need additional materials to conduct legal research. Specifically, prisoners need self-help manuals that direct them on substantive and procedural issues to help them do legal work.[99] However, not all of the facilities have self-help manuals. Prisoners had occasion to use self-help manuals because they were the personal property of the law clerk.[100] Legal assistants find they need, but often do not have, Pacific Second to review a case discovered through the shepardizing of an Arizona case; immigration material; and post-conviction manuals.[101] Many prisoners are confronted with immigration issues, particularly deportation detainers.[102]

Some of the libraries including Perryville, SMU, CB-6, the East unit, the North unit and the women's unit at Florence; the Santa Rita Unit at Tucson; the Mohave unit and Gila units at Douglas: and the Kaibab unit at Winslow contain self-help litigation manuals including the supplementary pamphlet or the 1983 edition of the *Prisoner's Self-Help Litigation Manual*.[103] Some of the libraries including Perryville contain the Pacific Second series.[104]

Facility administrators have removed from the law libraries legal materials that are not on the "Muecke list."[105]

## G. Legal supplies/Indigency standard

ADOC's indigency standard prevents prisoners from purchasing necessary legal supplies. The ADOC policy regarding indigency, set forth in Policy 302.11, provides that a prisoner is not provided basic legal supplies at ADOC expense if, at any time during the previous thirty-day period, the prisoner's ac-

92. The *Muecke* list is a list of legal books that are required to be in the Central Unit law library. *Wilkinson v. McDougal*, Civ. 81-1397 PHX CAM; *See also* Exh. 217 p. 27.

93. Stip., p. 2, Ia.

94. Stip., p. 9, 7.F.

95. Stip., p. 3, Alg.

96. Stip., 17, 15f.

97. Stip., p. 16, g.

98. Doe I testimony, 12/17/1991, p. 252, lines 2-8, p. 254, lines 9-25, p. 2, lines 2-3.

99. Bishop testimony, 12/17/1991, p. 148, lines 1-25; Doe I testimony, 12/17/1991, p. 256, lines 22-25, p. 257, lines 1-5; McQuillen testimony, 12/19/1991, p. 116, lines 15-21, p. 117, lines 24-25, p. 118, lines 1-11, p. 128, lines 8-25; Tyszkiewicz testimony, 1/7/1992, p. 156, lines 7-12; Wilber testimony, 11/22/1991, p. 167, lines 8-25; p. 168, lines 1-2.

100. Doe I testimony, 12/17/1991, p. 266, lines 16-23.

101. Doe I testimony, 12/17/1991, p. 256, lines 7-13; Bishop testimony, 12/17/1991, p. 149, lines 1-21; McQuillen testimony, 12/19/1991 p. 119, lines 8-18.

102. McQuillen testimony, 12/19/1991, p. 119, lines 5-16.

103. Cathcart testimony, 1/7/1992, p. 98, lines 3-18; Tyszkiewicz testimony, 1/7/1992, p. 153, lines 2-7; Joyner testimony, 1/15/92, p. 110, lines 16-18; Stip., p. 3, lines 13-17, p. 5, lines 11-15, p. 7, lines 10-14; p. 10, lines 25-26; p. 11, lines 3-6, p. 11, lines 25-26; p. 12, lines 7-9.

104. Cathcart testimony, 1/7/1992, p. 98, lines 3-18.

105. McQuillen testimony, 12/19/1991, p. 120, lines 1-11; Friego testimony, 1/9/1992, p. 80, lines 3-20.

count balance exceeded twenty-two dollars.[106] ADOC makes no individual evaluation of what the prisoner purchased during the previous thirty-day period in order to assess whether or not the prisoner has a valid need for indigency status.[107] The twenty-two dollar standard was not based on a comparison of the actual average monthly consumption of basic general supplies, including hygiene items and legal supplies, and their cost. Rather, the standard was arrived at by applying an inflation factor to the fourteen-year-old twelve-dollar standard.[108]

If the prisoner is granted indigency status and receives legal supplies, the prisoner's account is debited the amount of the legal supplies and the debit is held against the account until funds are available in the prisoner's account to pay off the debt.[109]

If the prisoner is denied indigency status, he or she cannot reapply until thirty days after the date his or her account went above the indigency standard.[110] Further, Prisoners must reapply for indigency status whenever they are transferred to another facility.[111]

Under the twenty-two dollar standard, if a prisoner purchases basic hygiene and general supplies, such as coffee, that prisoner is unable to purchase needed legal supplies.[112] A prisoner could spend twenty dollars on basic supplies.[113] It is not unusual for a prisoner to spend twenty-four dollars at the prison store.[114]

The appropriate indigency standard cannot be determined without evaluating the actual cost of basic necessities and legal supplies.[115] A recent study of the actual cost and prisoner consumption of basic supplies and legal supplies at the Central unit in Florence, resulted in the establishment of a forty-six dollar indigency standard. *Gluth v. Kangas*, 773 F.Supp. 1309, 323 (D.Ariz.1988), *aff'd*, 951 F.2d 1504 (1991).

### H. Photocopy Policy

ADOC's photocopy policy does not ensure that the substance of prisoners' confidential legal materials are not read by other prisoners or staff. Prisoners or library staff photocopy prisoners' confidential legal materials.[116] For example, at SMU at Florence, legal documents are copied by putting them under the cell door. An officer will pick up the document and copies will be received back in two to three days.[117] Alternatively, an inmate at the law library may request copies. An officer scans the material for the contraband, then an inmate clerk copies the materials.[118] In a few units including Perryville, Rynning at Florence and Santa Rita at Tucson, those inmates allowed into the library may watch their copies being made.[119] Prisoners have observed people reading prisoners' legal documents while copying them.[120]

---

**106.** Exh. 216, ADC policy no. 302.11, § 6.14.1.

**107.** McFadden testimony, 1/8/1992, p. 137, lines 1–5.

**108.** Keeney testimony, 1/27/1992, p. 42, lines 21–25, p. 43, lines 1–21.

**109.** Exh. 50, Executive staff Meeting Minutes, ASPC–T, 1/20/89.

**110.** McFadden testimony, 1/8/1992, p. 135, lines 5–13.

**111.** Exh. 790, p. 2, § 5.4.

**112.** Bishop testimony, 12/17/1991, p. 154, lines 4–21.

**113.** McFadden testimony, 1/8/1992, p. 136, lines 3–14.

**114.** McFadden testimony, 1/8/1992, p. 135, lines 1–3.

**115.** Wilber testimony, 11/22/1991, p. 169, lines 1–9.

**116.** Joyner dep., p. 29, lines 1–2; Ori testimony, 1/15/1992, p. 145, lines 9–15; Cathcart dep., p. 40, lines 10–11; Exh. 283, attachment 301.11, SMU, p. 5, § 5.7.3; Exh. 295; Stip., p. 21, § 7d.

**117.** Bishop testimony, 12/17/1991, p. 151, lines 8–19.

**118.** Tyszkiewicz testimony, 1/7/1992, p. 162, lines 17–25, p. 163, lines 1–25, p. 164, lines 1–9.

**119.** Cathcart testimony, 1/7/1992, p. 102, lines 13–25, p. 103, lines 1–3; Powell testimony, 1/7/1992, p. 265, lines 16–25; Joyner testimony, 1/15/1992, p. 108, lines 7–21.

**120.** Bishop testimony, 12/17/1991, p. 151, lines 20–25.

In addition, the opportunity to breach the confidentiality of legal documents is increased by the delays in receiving photocopies. Prisoners in lockdown in Perryville may wait as long as nine days to have legal materials photocopied. Photocopies in general may take one to two full days.[121] There is a need for posting a policy by the photocopier which states that ADOC civilian or prisoner staff shall not read the substance of a prisoner's confidential legal papers that have been submitted for photocopying.[122]

## I. Attorney/client phone calls

Defendants interfere with prisoners' ability to make confidential attorney-client telephone calls. Prisoners are arbitrarily denied confidential attorney-client telephone calls by restrictive ADOC policies and procedures. If prisoners do not have an attorney of record, they must have court papers that verify that they are representing themselves and have filed an action with the court.[123] Prisoners with an attorney of record must substantiate a need for telephonic communication with that attorney or the attorney's agent that cannot be met by utilizing the mail or attorney visitation. Prisoners are advised that calls should be requested and will only be approved in response to legitimate pressing legal issues with short time parameters, such as a court-ordered deadline.[124] If prisoners have not filed an action

pro se, or do not have an attorney of record, they are unable to interview a prospective attorney by telephone.[125]

The Correctional Program Officers (CPO) may deny prisoners confidential attorney-client calls because the staff is too busy or because the staff makes a determination that the prisoner's need for a confidential attorney-client call can be handled by written correspondence or by attorney-client visitation.[126] The CPO is not required to justify in writing a decision to deny a prisoner confidential attorney-client call.[127]

Further, there is no policy requiring a staff person to leave the room while a prisoner is attempting to make a confidential attorney-client call, even when the staff person is able to view the prisoner through a window.[128] CPOs have refused to leave the room and have remained within hearing range while a prisoner is attempting to make confidential attorney-client call, even when the staff person is able to view the prisoner through a window.[129]

ADOC's official policy is based on the belief that the primary means of communication between a prisoner and his attorney should be by written correspondence. Yet, ADOC realizes that prisoners have other issues besides court deadlines necessitating a call to an attorney.[130] The primary reason ADOC requires justification for a confidential attor-

---

121. Exh. 249kb, memo dated 9/21/1990; Stip., p. 16, § 14d.

122. Wilber testimony, 11/22/1991, p. 170, lines 5–13.

123. Exh. 212, p. 3, § 4.4; Exh. 202, p. 3, § 4.4; Exh. 262ds; Exh. 214, Nicholas Cortez, 33601, 1/8/91; Exh. 260ff.

124. Exh. 213, p. 3, § 5.13, 15–13–1; Exh. 214 (form designating attorney of record); Keeney testimony, 1/27/1992, p. 40, lines 20–24; Keeney dep., p. 37, lines 1–7; Exh. 799, p. 4, § 5.3, 5.3.1.2; Exh. 283, attachment ADC–ASPC C–F, SMU, IMP 302.11, p. 4, § 5.7.3; Tyszkiewicz testimony, 1/7/1992, p. 171, lines 21–24; Exh. 207, § 5.1.2, 5.1.2.4, 5.1.2.6; Exh. 209, attachment # 1; Exh. 262dr; Exh. 262et; Exh. 214, Jack Barret # 55143, 11/15/90, and James Johnson, 11/20/90.

125. Booker testimony, 12/18/1991, p. 277, lines 10–15.

126. Keeney dep., p. 37, lines 1–7; Keeney testimony, 1/27/1992, p. 41, lines 1–6; Exh. 243adbj; Exh. 66qq.

127. Keeney dep., p. 37, 13–18.

128. Keeney dep., p. 85, lines 1–25; Keeney testimony, 1/27/1992, p. 42, lines 8–12.

129. Keeney dep., p. 85, lines 1–25; Keeney testimony, 1/27/1992, p. 41, lines 20–25, p. 42, lines 1–12; Exh. 244aaf; Booker testimony 12/18/1991, p. 278, lines 1–8, p. 279, lines 8–25; Coley testimony, 12/19/1991, p. 104, lines 2–3, p. 105–106, lines 1–7; Wilber testimony, 11/22/1991, p. 160, lines 12–15; p. 161, lines 12–15.

130. Keeney testimony, 1/27/1992, p. 40, lines 20–24.

ney-client call is because the call takes some staff time and the prisoner is using a state phone.[131]

Because the Central Office policies provide few objective guidelines for determining when a request for a call should be granted or denied,[132] facilities and individual staff have developed different policies or procedures, many of which interfere with the right to have confidential telephone contact with an attorney or the attorney's agent.[133] The CB–6 policy limits the reasons for an attorney-client call to issues related to a prisoner's sentence.[134] At SMU, a prisoner's institutional risk score, not his need, will determine how often he is allowed legal call.[135] At the Central unit in Florence, limitations have been placed on the number of telephone calls prisoners can make per week. Prisoners were allowed one call per week in 1989 [136] and two calls per week in 1990.[137] No distinction is made between attorney and non-attorney calls.[138] At the Perryville facility and the Cimarron unit at Tucson, the prisoner must tell the CPO the exact nature of the call before the confidential attorney-client call is granted.[139]

Prisoners who cannot satisfy staff that they have need for a confidential attorney-client phone call are forced to speak to their attorney on monitored telephones.[140] This policy significantly diminishes the ability of prisoners to have access to the courts because they are unable to have confidential attorney-client calls.[141]

## II. Post–Filing Changes

The defendants made the following changes relevant to the access to the courts issues after the filing of this lawsuit. A number of the law libraries throughout the state did not have the complete "Muecke list" until after this lawsuit was filed.[142] Further, some facilities had no law library or a limited "resource" library prior to the filing of the lawsuit.[143]

The defendants expanded the law library hours at a number of institutions after the lawsuit was filed.[144] Prior to the expansion of law library hours, prisoners had insufficient time in the law libraries.[145]

The defendants also increased the indigency standard or legal access from $12.00 per 30 days to $22.00 per 30 days effective March 15, 1991.[146]

131. Keeney testimony, 1/27/1992, p. 41, lines 4–8.

132. Wilber testimony, 11/22/1991, p. 160, lines 1–6.

133. Wilber testimony, 11/22/1991, p. 160, lines 1–6.

134. Exh. 799, § 4.4.

135. Exh. 43x, see SMU Orientation Package, p. 2.

136. Exh. 262dy.

137. Exh. 262ep.

138. Exh. 262dx.

139. Coley testimony, 12/19/1991, p. 109, lines 9–17; Exh. 207, § 5.1.1; Exh. 214, Booker # 42595, 8/6/90, King # 37415, 12/24/90, Burks # 80338, 12/17/90, Parker # 50912, 2/28/90.

In one instance at the North Unit in Florence, a prisoner who provided ADOC staff with all essential information including an attorney telephone number and evidence of a court deadline and who attempted to arrange the call 48 hours in advance was denied the call because he re-

fused to reveal the exact nature of the problem. Exh 260gg.

140. Wilber testimony, 11/22/1991, p. 160, lines 1–11; Celaya testimony 12/17/1991, p. 54, lines 22–25, p. 55, lines 9–20, p. 57, lines 13–19, p. 58, lines 1–5.

141. Wilber testimony, 11/22/1991, p. 163, Lines 4–10.

142. Exh. 50, Library Inventories, 6/25/90, p. 4; Keeney dep., p. 28, lines 1–25, p. 29, lines 9–19; McQuillen testimony, 12/19/1991, p. 116, lines 8–14.

143. Exh. 279, ASPC–PV Warden's meeting minutes, 9/11/30; McQuillen test., p. 113, lines 1–3; Cathcart testimony, p. 111, lines 23–25.

144. Exh. 50, Executive Staff Meeting Minutes, dated 11/13/1990, p. 4, Exh. 216, effective March 15, 1991, p. 3, § 6.2.3; Exh. 231.

145. Exh. 279, Warden's minutes, ASPC–PHX, August 1, 1989; Exh. 250r; Exh. 252k; Stip., p. 4, 2d, p. 15, 13d.

146. Exh. 216, p. 9, § 6.14.1, Keeney testimony, 1/27/1992, p. 42, lines 13–25, p. 43, lines 1–8.

## CONCLUSIONS OF LAW

### I. Access to the Courts

 Prisoners have a constitutional right of access to the courts that is adequate, effective and meaningful. *Bounds v. Smith,* 430 U.S. 817, 822, 97 S.Ct. 1491, 1495, 52 L.Ed.2d 72 (1977). This right of access to the courts "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds,* 430 U.S. at 828, 97 S.Ct. at 1498. "It is the state's burden to provide meaningful access and to demonstrate that its chosen method is adequate." *Gluth v. Kangas,* 951 F.2d 1504, 1508 (9th Cir.1991), citing *Storseth v. Spellman,* 654 F.2d 1349, 1352 (9th Cir. 1981). Prisoners alleging interference with their access to the courts need not allege "actual injury" if one of the core requirements under *Bounds* is involved. *Sands v. Lewis,* 886 F.2d 1166, 1171 (9th Cir.1989). Adequacy of legal assistance is such a core requirement. *Id.*

 The prison may preclude physical access to segregated inmates if such access would interfere with institutional security.[147] *Toussaint v. McCarthy,* 801 F.2d 1080, 1109 (9th Cir.1986), *cert. denied,* 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987). *See also, Wood v. Housewright,* 900 F.2d 1332, 1335 (9th Cir.1990); *Lindquist v. Idaho St. Bd. of Corrections,* 776 F.2d 851, 858 (9th Cir.1985). However, if the state denies physical access to the law library, the state must provide that prisoner with legal assistance. *Toussaint,* 801 F.2d at 1110. The *Bounds* court listed several alternatives to physical access including the training of inmates as paralegal assistants to work under lawyers' supervision, the use of paraprofessionals and law students, volunteer attorneys, or staff attorneys working with prisoner legal assistance organizations. *Bounds,* 430 U.S. at 831, 97 S.Ct. at 1499–1500. The legal access program need not include these particular

elements but must be evaluated as a whole. *Bounds,* 430 U.S. at 831, 97 S.Ct. at 1499–1500. "*Bounds* requires, in the absence of adequate law libraries, 'some degree of professional or quasi-professional legal assistance to prisoners.'" *Gluth,* 951 F.2d at 1511.

 A "paging system," in which a prisoner who is denied direct access to the law library is allowed to request that legal materials be brought to his or her cell, does not provide adequate access to the courts. In *Toussaint,* the Ninth Circuit accepted the prisoners' contention that a paging system that allowed a prisoner to order five books per week was constitutionally deficient:

> Simply providing a prisoner with books in his cell, if he requests them, gives the prisoner no meaningful change [sic] to explore the legal remedies that he might have. Legal research often requires browsing through various materials in search of inspiration; tentative theories may have to be abandoned in the course of research in the face of unfamiliar adverse precedent. New theories may occur as a result of a chance discovery or an obscure or forgotten case. Certainly a prisoner, unversed in the law and the methods of legal research, will need more time or more assistance than the trained lawyer exploring his case. It is unrealistic to expect a prisoner to know in advance exactly what materials he needs to consult.

*Toussaint,* 801 F.2d at 1109–10, quoting *Williams v. Leeke,* 584 F.2d 1336, 1339 (4th Cir.1978), *cert. denied,* 442 U.S. 911, 99 S.Ct. 2825, 61 L.Ed.2d 276 (1979). *See also Griffin v. Coughlin,* 743 F.Supp. 1006, 1019–25 (N.D.N.Y.1990) (paging system that allows two books a day is inadequate).

 Untrained prisoner legal assistants cannot provide constitutionally sufficient access to the courts for prisoners denied access to a law library. *Gluth,* 951 F.2d at 1508.[148] "*Bounds* requires the assistance

---

147. Generalized security concerns are insufficient to support a denial of physical access to the law library. *DeMallory v. Cullen,* 855 F.2d 442, 448 (7th Cir.1988).

148. See also, *Valentine v. Beyer,* 850 F.2d 951, 956–57 (3rd Cir.1988); *DeMallory,* 855 F.2d at 447; *Walters v. Thompson,* 615 F.Supp. 330, 340 (D.C.Ill.1985); *Cody v. Hillard,* 599 F.Supp. 1025, 1061 (D.S.D.1984); *Canterino v. Wilson,*

of those 'trained' in the law; the appearance of minimal capacity to assist other inmates alone plainly does not suffice." *Gluth*, 951 F.2d at 1508. Although legal training need not be extensive, *Bounds* does require that inmates be provided the legal assistance of persons with at least some training in the law." *Gluth*, 951 F.2d at 1511.

■ Moreover, even the best law library is of no use to prisoners who are functionally illiterate in English. *Cruz v. Hauck*, 627 F.2d 710, 721 (5th Cir.1980). Library books, even if adequate in number, cannot provide access to the courts for those persons who do not speak English or who are illiterate. *Id.* See also, *Valentine*, 850 F.2d at 957; *U.S. ex rel. Para–Professional Law Clinic v. Kane*, 656 F.Supp. 1099, 1105–07 (E.D.Pa.1987), *aff'd without opinion*, 835 F.2d 285 (3d Cir. 1987); *cert. denied nom. Zimmerman v. Para–Professional Law Clinic*, 485 U.S. 993, 108 S.Ct. 1302, 99 L.Ed.2d 511 (1988); *Cody*, 599 F.Supp. at 1061; *Canterino*, 562 F.Supp. at 110.

■ Meaningful access to the courts requires direct assistance for prisoners who because of language factors or lack of access to the law library, or for other reasons are unable to perform adequate legal research and writing. In the absence of a program providing such prisoners with lawyers or paralegals, ADOC must maintain a sufficient number of at least minimally trained prisoner legal assistants. *Gluth v. Kangas*, 773 F.Supp. 1309, 1318–19 (D.Ariz.1988), *aff'd*, 951 F.2d 1504 (9th Cir.1991). In *Gluth*, this Court ordered [for the Central Unit in Florence] the development of a legal research and writing course that must be successfully completed by all legal assistants. The work of legal assistants was to be supervised on a continuing basis by the legal research instructor. *Gluth*, 773 F.Supp. at 1319–20. Clearly, the law requires for those prisoners denied physical access to the law libraries [either because they are in lockdown, illiterate or non-English speaking or are denied

access to the books within the law libraries] the defendants must provide trained legal assistants. The evidence in this case establishes that the legal assistants provided by the ADOC are not trained sufficiently to meet the *Bounds* requirements. Locked down, illiterate or non-English speaking inmates must rely on an inadequate number of inmate clerks with no formalized training or supervision by attorneys. Such a system fails to comply with the requirements of *Bounds*. *Valentine*, 850 F.2d at 956–57.

## II. *Law library staffing*

■ To provide adequate access to the courts, a law library must be staffed by a person with adequate legal training; a law library staffed only by security officers untrained in legal research and writing is not sufficient.[149] Therefore, this court in *Gluth* [Central Unit in Florence] ordered defendants to provide at least one full-time professionally trained librarian at the Central Unit law library, as well as adequate secretarial support. *See Gluth*, No. CIV 84–1626–PHX–CAM, Order, July 9, 1991, p. 4; *See also Peterkin v. Jeffes*, 855 F.2d 1021, 1038 (3rd Cir. 988) (death row prisoners who are denied direct access to law library must have assistance from attorneys for post-conviction and civil rights filings); *Valentine*, 850 F.2d at 956 (prisoner paralegals who are not provided continuing legal education cannot provide adequate access to prisoners who were denied direct access to law library); *Carter v. Fair*, 786 F.2d 433, 434 (1st Cir.1986) (meaningful access provided where attorneys were available to prisoners who were denied direct library access). The Court also ordered that prisoner law library clerks, in order to perform their duties adequately, must successfully complete the same legal research course as prisoner legal assistants. *Gluth*, 773 F.Supp. at 1318.

## III. *Indigent Standard/Supplies*

■ Indigent prisoners must be provided sufficient legal supplies and services to

---

562 F.Supp. 106, 110–111 (W.D.Ky.1983); *Wade v. Kane*, 448 F.Supp. 678, 683 (E.D.Penn.1978).

**149.** Indeed, defendants themselves concede this. For example, in a memo dated October 30, 1989,

J.C. Keeney, Assistant Director for Adult Institutions, directed that—"[e]ach library shall have a trained librarian." Exhibit 1 to Keeney dep.

ensure meaningful access to the courts. *Bounds*, 430 U.S. at 824, 97 S.Ct. at 1496. A policy which forces inmates to choose between purchasing hygenic supplies and essential legal supplies is unacceptable. *Gluth*, 951 F.2d at 1508.

In *Gluth*, this Court ordered that a prisoner in the Central Unit in Florence is eligible for basic legal supplies and services if he has less than $46.00 in his account at the time of the request. *Gluth*, 773 F.Supp. at 1324. The Ninth Circuit affirmed, noting that "[t]he uncontroverted facts show that it costs at least $46 to purchase necessary personal items and legal supplies and that inmates must purchase hygiene items to avoid punishment under prison regulations." *Gluth*, 951 F.2d at 1508.

■ In this case, the ADOC established the $22 indigency standard by applying an inflation factor to the 14-year old $12 standard.[150] The standard is not based on actual costs of hygiene items. Under this $22 standard, a prisoner cannot purchase both hygiene items and legal supplies. Clearly, the $22 standard is insufficient to insure that indigent prisoners receive sufficient legal supplies.

### IV. *Contents of the law libraries*

■ After the filing of this action, the defendants expanded their resources in the law libraries. Generally, the facilities appear to have complete libraries.[151] Some of the libraries contain, and all of the libraries should contain, copies of prisoner self-help manuals. Without self-help manuals, prisoners who are untrained in the law cannot use the legal books in the libraries and the defendants have not provided "meaningful" access to the courts. It also appears that the Pacific Digests and Reporters may be necessary for the inmates to pursue their cases.

### V. *Photocopy Policy*

■ Because the photocopy policies allow staff or other inmates to photocopy a prisoner's confidential legal information, the confidentiality of legal documents is breached by staff or other inmates. Staff, who may be named defendants in civil rights actions, have access to confidential legal materials of inmates. For these reasons, the prison needs a policy to assure that legal documents to be photocopied remain confidential and are not read by other inmates or staff.

### VI. *Legal telephone calls*

■ Prisoners must have a reasonable opportunity to seek and receive the assistance of attorneys for civil as well as criminal matters. Therefore, regulations and practices that unjustifiably restrict the availability of professional representation are invalid. *Procunier v. Martinez*, 416 U.S. 396, 419, 94 S.Ct. 1800, 1814-15, 40 L.Ed.2d 224 (1974) (ban on attorneys' use of paralegals and law students to interview prisoners). Reasonable access to telephones is an important component of a prisoner's right of access to courts and counsel. See, *Divers v. Department of Corrections*, 921 F.2d 191, 194 (8th Cir.1990) (allegation that prisoners were permitted to telephone an attorney only if they had a court appearance within 30 days stated a claim); *Johnson–El v. Schoemehl*, 878 F.2d 1043, 1052 (3th Cir.1989) (allowing prisoners only one attorney call every two weeks, and counting calls as made when the attorney was not reached, is "patently inadequate"). "[T]he ability of counsel to visit the jail cannot always compensate for an inmate's initial inability to ask an attorney to visit. Worse yet, inmates who have not yet retained an attorney are obviously prejudiced if they can only make one call during business hours every two weeks." *Johnson–El*, 878 F.2d at 1052.

■ Moreover, effective access to attorneys in the prison context requires that the

---

**150.** The Court notes that inmates are not given supplies. The cost of the supplies is debited to the inmates' accounts. Thus, if the inmate ever has money deposited to the account, ADOC recovers the cost of the legal supplies.

**151.** The Court takes judicial notice of the fact that this federal court donates to the Arizona prison system its advance sheets, paperback reporters and older editions of books to help lower costs for the state prison system.

traditional privacy of the attorney/client relationship be protected. *See Ching v. Lewis,* 895 F.2d 608, 609 (9th Cir.1990) ("The opportunity to communicate privately with an attorney is an important part of meaningful access to the courts."). "Forcing prisoners to conduct their meetings with their attorneys in the open or to yell over the phone obviously compromises the consultation." *Johnson–El,* 878 F.2d at 1052. Thus, in *Gluth,* this Court reminded defendants of their obligation "to facilitate confidential and privileged contacts between Central Unit prisoners and outside lawyers, authorized paralegals, legal organizations, governmental agencies and courts, through regular visits and adequate use of telephones and mails." 773 F.Supp. at 1321. See also, *Dawson v. Kendrick,* 527 F.Supp. 1252, 1313–14 (S.D.W.Va.1981) (failure to provide sufficient and regular telephone service in the jail operates to deprive prisoners of their right to have a reasonable opportunity to seek and receive the assistance of attorneys).

In this case, the prisoners are arbitrarily denied confidential attorney-client phone calls. The lack of a Central office policy allows individual prisons to set arbitrary standards that allow for improper denial of calls to counsel. Prison staff are not required to justify the denial in writing. In addition, prisoners are forced speak to their attorneys on monitored lines or within hearing range of prison staff. Thus, inmates are denied access to the courts.

### Injunctive Relief

Because the defendants' system fails to comply with constitutional standards, the Court has determined that injunctive relief is appropriate for the access to the courts issues.

Many of the issues in this case have been resolved for the Central Unit in Florence by the Special Master [Dan Pachoda] and his assistant [Janet Bliss] appointed in the *Gluth* case. In addition, the Ninth Circuit has affirmed the resolution of those issues. Therefore, the Court intends to appoint Dan Pachoda as Special Master and Expert and Janet Bliss as Assistant Special Master to work with the parties and develop the proper

injunctive relief. A detailed order will follow setting forth the duties of the Special Master.

For those issues that have been resolved successfully in *Gluth,* the Court intends to implement the *Gluth* policies statewide, with any modifications that the parties and Special Master determine are necessary due to the particular circumstances of the prison facility. For the remaining issues not addressed in *Gluth,* the Special Master and his assistant will work with the parties to develop the proper injunctive relief for plaintiffs.